IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-873

Filed: 19 May 2020

Iredell County, No. 13 CVS 2701

KIM and BARRY LIPPARD, Plaintiffs,

v.

LARRY HOLLEMAN and ALAN HIX, Defendants.

Appeal by Plaintiffs from order entered 17 April 2018 by Judge Mark E. Klass in Iredell County Superior Court. Heard in the Court of Appeals 14 March 2019.

*Seth B Weinshenker, P.A., by Seth B. Weinshenker, for plaintiffs-appellants.*

*Gibbs & Associates Law Firm, LLC, by Seth J. Kraus and E. Bedford Cannon, for defendants-appellees.*

MURPHY, Judge.

Kim Lippard ("Mrs. Lippard") and Barry Lippard ("Mr. Lippard") (together, "Plaintiffs") allege multiple claims of defamation against Larry Holleman ("Holleman") and Alan Hix ("Hix") (together, "Defendants"). The First Amendment does not permit courts to hear defamation claims when they were made during an internal religious dispute regarding ecclesiastical matters. We affirm the trial court's grant of summary judgment in favor of Defendants.

## BACKGROUND

Plaintiffs were members of Diamond Hill Baptist Church ("DHBC"), where Mrs. Lippard had served as church pianist and vocalist. Holleman was the Pastor of the Church and Hix was Minister of Music. Holleman was DHBC's leader and was "responsible for leading [DHBC] to function as a New Testament Church." This included leading the congregation and DHBC staff to perform their tasks and caring for the DHBC members. Hix directed DHBC's music organization. Its purpose was "to teach music, train persons to lead, sing, and play music, [and] provide music in the [DHBC] and community." Under Hix's direction, the music organization "provide[d] and interpret[ed] information regarding the work of the [DHBC] and denomination."

On 8 August 2012, Mrs. Lippard and Hix had a disagreement over the re-assignment of a music solo. The solo was originally assigned to Mrs. Lippard for an upcoming Sunday morning service. Hix, however, asked another choir member to perform the solo and Mrs. Lippard was upset about the reassignment. When an internal conflict between church members arises, DHBC's bylaws maintain that "the pastor and the deacons will take every reasonable measure to resolve the problem in accord with Matthew 18."

As church leader, Holleman began meeting with Mrs. Lippard and Hix to facilitate a "reconciliation" between them and an "improved relationship based on

biblical passages." On 26 August 2012, after several unsuccessful reconciliation meetings, Holleman met with the Board of Deacons ("Deacons") to discuss whether Mrs. Lippard should be dismissed from her position as DHBC pianist. At the meeting, the Deacons voted to recommend Mrs. Lippard's dismissal to DHBC's Church Personnel Committee ("the Personnel Committee"). Three days later, Holleman informed Mrs. Lippard that the Deacons had voted to recommend her dismissal.

In response to a voice message from Mr. Lippard, Holleman arranged further counseling sessions between Mrs. Lippard and Hix. The sessions were to continue seeking a "reconciliation" between the two and were scheduled for late September through October 2012.

Ultimately, the Deacons announced its decision to again recommend Mrs. Lippard's dismissal and re-submitted its recommendation to the Personnel Committee. The Personnel Committee met and voted to recommend to the full congregation that Mrs. Lippard be dismissed as DHBC pianist. The decision had to be approved by an affirmative vote of three-fourths of DHBC members. On 13 November 2012, Holleman delivered a letter to Mrs. Lippard, setting forth the reasons for his recommendation to dismiss her as pianist.[1]

---

[1] Although the 13 November letter Holleman sent to Mrs. Lippard is not included in the Record, Plaintiffs assert the 13 November letter is a shortened version of a 28 November 2012 letter made available to the full DHBC congregation, which is included in the Record. Defendants do not contest this assertion.

On 25 November 2012, during the morning DHBC church service, Holleman announced to his congregation that there would be a "church-wide" meeting and a vote in three days. At that meeting, DHBC staff would be discussed and it was part of the responsibilities of members to be present for the discussion and to vote. He also said that a written letter explaining a motion and absentee ballots for the motion would be made available.

At the "church-wide" meeting on 28 November 2012, Holleman delivered a sermon on the motion to terminate Mrs. Lippard from the pianist position. He repeatedly stated that the recommendation for Mrs. Lippard's dismissal stemmed from her "unwillingness to commit" to the DHBC's reconciliation process. After the meeting, Holleman left printed copies of his 28 November 2012 sermon in the foyer for members of the congregation. He also made a letter available titled "Concluding Comments to the Present disciplinary Actions by The Body of Deacons and the Personnel Committee (November 13, 2012)." It said, "I (we) have yet to hear you acknowledge any personal responsibility for your failures." The letter concluded that Mrs. Lippard, "by placing conditions upon [her] obedience to the scriptures as they regard reconciliation, ha[s] been the obstacle to that reconciliation."

In a sermon on 2 December 2012, Holleman advocated for the DHBC congregation to remove Mrs. Lippard from the pianist position. Ballots were distributed stating the Deacons recommended the dismissal of Mrs. Lippard "due to

her unwillingness to admit to any wrongdoing, or to commit unconditionally to the process of reconciliation." The congregation voted against dismissal, and Mrs. Lippard remained in her position. Holleman and Hix also continued in their respective leadership positions.

Plaintiffs allege that, after the vote, Holleman and the Deacons unsuccessfully sought to remove them as members of DHBC, and that Defendants continued to speak with members of the congregation about Plaintiffs. Plaintiffs contend that in Holleman's sermons he "continued . . . to defame [Plaintiffs] by consistently preaching against those who would not commit to reconciliation," alluding to Plaintiffs. Plaintiffs further contend Hix said to a DHBC member that "[Mr.] Lippard is a liar and you and other people like you are believing him instead of the Scripture." On 8 January 2013, Hix also emailed DHBC member Tony Brewer ("Brewer") about the situation, stating Plaintiffs were "openly denying" "verifiable facts" about the reconciliation process.

Holleman also communicated with others about Plaintiffs. When Brewer complained of the efforts to remove Plaintiffs, Holleman sent a letter to him alleging that Mrs. Lippard "refuses to acknowledge any wrongdoing, and that she was unwilling to commit unconditionally to the process of reconciliation." In a 6 April 2013 email, Holleman claimed Mr. Lippard once "blocked [Hix's] exit from the music room and was aggressively going after [Hix], pointing his finger in [Hix]'s face, an

action [Holleman] recently learned was illegal and could have very well been reported as a crime." Holleman also emailed DHBC member A.W. Myers ("Myers"), stating Mrs. Lippard failed to acknowledge her own role in the dispute between her and Hix. In August 2013, Mrs. Lippard resigned her position as DHBC pianist and Plaintiffs began attending another church.

## A. *Unpublished Lippard*

Shortly after Mrs. Lippard's resignation, Plaintiffs filed this action against DHBC and Defendants, alleging they were defamed by Defendants, who Plaintiffs also allege committed *ultra vires* corporate activities. In their answer, Defendants moved to dismiss Plaintiffs' complaint under N.C.G.S. § 1A-1, Rule 12(b)(1) for lack of subject matter jurisdiction. Plaintiffs voluntarily dismissed their claim against DHBC without prejudice, leaving only their claims against Defendants. Defendants' Rule 12(b)(1) motion to dismiss was denied by Judge Anna Mills Wagoner on 25 May 2014. Defendants later moved to dismiss Plaintiffs' second cause of action for *ultra vires* activities, and Judge Theodore Royster granted Defendants' motion, leaving only the claims for defamation against Defendants.

After retaining new counsel, Plaintiffs filed a separate civil action (No. 15-CVS-606) against Defendants and DHBC upon nearly identical claims of defamation, *ultra vires* activities, and negligent supervision while the claims in the 2013 case were still active. Defendants moved to dismiss the claims in No. 15-CVS-606 and made an oral

motion to dismiss the claims in this case as well. Judge Michael Duncan dismissed the claims in No. 15-CVS-606 while refusing to rule on Defendants' oral motion to dismiss the claims in this case, finding that Judge Wagoner had previously ruled on that issue.

Defendants filed an additional motion to dismiss Plaintiffs' remaining defamation claims in this case on 16 February 2016 for lack of subject matter jurisdiction under N.C.G.S. § 1A-1, Rule 12(b)(1) and failure to state a claim upon which relief can be granted under N.C.G.S. § 1A-1, Rule 12(b)(6). Judge Martin B. McGee heard the motion on 21 March 2016 and dismissed Plaintiffs' defamation claim in an order, stating "[t]he First Amendment deprives the [c]ourt of jurisdiction to resolve this dispute involving internal communications between church leadership and members of the congregation relating to issues of membership and music leadership."

Plaintiffs appealed and we vacated and remanded the judgment to the trial court in an unpublished opinion. *Lippard v. Holleman*, No. COA16-886, 253 N.C. App. 407, 798 S.E.2d 812, 2017 WL 1629377, at *3 (2017) (unpublished) (hereinafter *Unpublished Lippard*).[2] In vacating and remanding the trial court's dismissal of Plaintiffs' claims under Rule 12(b)(1), we held that Judge McGee's grant of Defendants' motion to dismiss impermissibly overruled Judge Wagoner's denial of

---

[2] Our recognition of the law of this case does not convert the holding in our previously unpublished opinion into binding precedent. *See* Rule 30(e).

Defendants' motion to dismiss in the same action. We reasoned subject matter jurisdiction is not an exception to the general rule that "one Superior Court judge may not correct another's errors of law; and . . . ordinarily one judge may not modify, overrule, or change the judgment of another Superior Court judge previously made in the same action." *Unpublished Lippard*, 2017 WL 1629377, at \*3 (quoting *Calloway v. Ford Motor Co.*, 281 N.C. 496, 501, 189 S.E.2d 484, 488 (1972)) (internal quotations omitted). We further held that none of the recognized exceptions to the *Calloway* rule applied. *See id.* at \*5. Although we discussed jurisdiction and the ecclesiastical entanglement doctrine under the First Amendment in dicta, our opinion did not reach the merits of the issue currently before us.

## B. Decision on Remand

On remand to the trial court, Defendants filed a motion for summary judgment under N.C.G.S. § 1A-1, Rule 56, stating there was no genuine issue as to any material fact and they were entitled to judgment as a matter of law. Judge Mark E. Klass granted Defendants' motion on the following grounds: (1) the First Amendment barred Plaintiffs' claims because "inquiry into the falsity of the claimed 'defamatory statements' would cross the ecclesiastical limitations prohibited by the First Amendment"; (2) "Defendants are entitled to judgment as a matter of law in their individual capacities" because Plaintiffs "failed to raise any forecast of evidence that Defendants made any of their statements in their individual capacities"; (3)

Defendants are entitled to judgment as a matter of law in their representative capacities because Plaintiffs voluntarily dismissed Defendants' principal, DHBC; (4) none of Defendants' statements were defamatory *per se* as a matter of law; and (5) Plaintiffs failed to "provide any evidentiary forecast that they suffered special damages because of any of Defendants' allegedly defamatory *per quod* statements." Plaintiffs appealed.

## ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2017). "We review a trial court's order granting or denying summary judgment *de novo*." *Craig ex rel. Craig v. New Hanover County Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 353 (2009) (internal citations omitted).

"Subject matter jurisdiction is conferred upon the courts by either the North Carolina Constitution or by statute." *Harris v. Pembaur*, 84 N.C. App. 666, 667, 353 S.E.2d 673, 675 (1987). "The question of subject matter jurisdiction may be raised at any time . . . ." *Lemmerman v. A.T. Williams Oil Co.*, 318 N.C. 577, 580, 350 S.E.2d 83, 85 (1986). "It is a universal rule of law that parties cannot, by consent, give a court, as such, jurisdiction over subject matter of which it would otherwise not have

jurisdiction. Jurisdiction in this sense cannot be obtained by consent of the parties, waiver, or estoppel." *Pulley v. Pulley*, 255 N.C. 423, 429, 121 S.E.2d 876, 880 (1961) (quoting *Hart v. Thomasville Motors, Inc.*, 244 N.C. 84, 88, 92 S.E.2d 673, 676 (1956)).

## A. First Amendment Ecclesiastical Entanglement Doctrine

Plaintiffs argue the trial court erred in granting summary judgment to Defendants for lack of subject matter jurisdiction on First Amendment grounds. According to Plaintiffs, their defamation claims do not require the trial court to impermissibly weigh church doctrine because "it is the conduct of [Defendants] in carrying on reconciliation proceedings and defaming [Plaintiffs] in the course of such proceedings, *and not the reconciliation proceeding itself*, that is at issue." In contrast, Defendants argue the trial court correctly held that the defamation claim is barred under the ecclesiastical entanglement doctrine because, to determine whether the alleged defamatory statements were false, courts would "becom[e] entangled in the statements made during the course of [DHBC]'s religious disciplinary and administrative activities between the Lippards, Holleman, Hix, and members and choir members of DHBC." We hold that determining the truth or falsity of Defendants' alleged defamatory statements—where the content of those statements concerns whether Plaintiffs complied with DHBC's practices—would require us to interpret or weigh ecclesiastical matters, an inquiry not permitted by the First Amendment.

"The Establishment Clause and the Free Exercise Clause of the First Amendment prohibit any 'law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Doe v. Diocese of Raleigh*, 242 N.C. App. 42, 47, 776 S.E.2d 29, 34 (2015) (quoting U.S. Const. amend. I.). "As applied to the states through the Fourteenth Amendment, the First Amendment also restricts action by state governments and the servants, agents and agencies, of state governments." *Hill v. Cox*, 108 N.C. App. 454, 461, 424 S.E.2d 201, 206 (1993) (citation and quotation marks omitted). There is "a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, *free from state interference*, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 97 L. Ed. 120 (1952) (emphasis added). "For the First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *McCollum* v. *Bd. of Ed.*, 333 U.S. 203, 212, 92 L. Ed. 649 (1948). We "are prohibited 'from becoming entangled in ecclesiastical matters' and have no jurisdiction over disputes which require an examination of religious doctrine and practice in order to resolve the matters at issue." *Doe*, 242 N.C. App. at 47, 776 S.E.2d at 34-35 (quoting *Johnson v. Antioch United Holy Church, Inc.*, 214 N.C. App. 507, 510, 714 S.E.2d 806, 810 (2011).

> An ecclesiastical matter is one which concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church; and all such matters are within the province of church courts and their decision will be respected by civil tribunals.

*Doe*, 242 N.C. App. at 47, 776 S.E.2d at 35 (quoting *E. Conference of Original Free Will Baptists of N.C. v. Piner*, 267 N.C. 74, 77, 147 S.E.2d 581, 583 (1966), *overruled in part on other grounds by Atkins v. Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973)). Hearing disputes over these matters is prohibited because of two concerns: "(1) by hearing religious disputes, a civil court could influence associational conduct, thereby chilling the free exercise of religious beliefs; and (2) by entering into a religious controversy and putting the enforcement power of the state behind a particular religious faction, a civil court risks 'establishing' a religion." *Id.* at 48, 776 S.E.2d at 35 (internal quotation marks omitted) (quoting *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 492, 598 S.E.2d 667, 670 (2004)).

These dangers demand dismissal "when 'no neutral principles of law exist to resolve claims' so that [a] court can 'avoid becoming impermissibly entangled in the dispute[.]'" *Id.* at 58, 776 S.E.2d at 41 (alterations omitted) (quoting *Harris v. Matthews*, 361 N.C. 265, 273, 643 S.E.2d 566, 571 (2007)). This necessitates an answer to a "dispositive question[:] whether resolution of the legal claim requires the

court to interpret or weigh church doctrine." *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398 (1998) (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 49 L. Ed. 2d 151, 163 (1976)). Only when an "issue to be determined in connection with [a party's] claim is a *purely secular* one," then "[n]eutral principles of law govern th[e] inquiry and . . . subject matter jurisdiction exists in the trial court over th[e] claim." *Doe*, 242 N.C. App. at 55, 776 S.E.2d at 39 (emphasis added); *see also Smith v. Raleigh Dist. of N.C. Conference of United Methodist Church*, 63 F. Supp. 2d 694, 713 (E.D.N.C. 1999) (holding that "[a] court must determine whether the dispute is an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law, or whether it is a case in which it should hold religious organizations liable in civil courts for purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization") (internal marks and citations omitted).

In *Harris*, our Supreme Court reaffirmed the importance of avoiding entanglement in matters such as ecclesiastical governance, doctrine, practice, questions, roles of officials, and internal decision-making. *Harris v. Matthews*, 361 N.C. 265, 271-73, 643 S.E.2d 566, 570-572 (referencing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 49 L. Ed. 2d 151, 163 (1976); *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368, 24 L. Ed. 2d 582, 583 (1970) (per curiam); *Presbyterian Church in U.S. v. Mary Elizabeth Blue*

*Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 21 L. Ed. 2d 658, 665 (1969)).

The Supreme Court concluded that

> [w]hen a party brings a proper complaint, where civil, contract, or property rights are involved, the courts will inquire as to whether the church tribunal acted within the scope of its authority and observed its own organic forms and rules.  But when a party challenges church actions *involving religious doctrine and practice*, court intervention is constitutionally forbidden.

*Harris*, 361 N.C. at 274–75, 643 S.E.2d at 572 (internal marks and citations omitted) (emphasis added).

Although our courts have not previously decided whether the ecclesiastical entanglement doctrine applies to defamation claims, "the principles set out [in *Harris*] concerning the limitations placed by the First Amendment on the subject matter jurisdiction of civil courts to adjudicate claims against religious entities are equally applicable here."  *Doe*, 242 N.C. App. at 49, 776 S.E.2d at 36.  Again, "[t]he dispositive question is whether resolution of the legal claim[s] requires the court to interpret or weigh church doctrine.  If not, the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim."  *Id.* at 49, 776 S.E.2d at 36 (alteration in original) (quoting *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398, *appeal dismissed*, 348 N.C. 284, 501 S.E.2d 913 (1998)).  Defamation claims present a unique challenge under this doctrine because, in North Carolina, as in other states, these claims include as an essential element the falsity of the defendant's alleged statements.  *See Parker v. Edwards*, 222 N.C. 75, 78, 21

S.E.2d 876, 878-89 (1942) ("It may be stated as a general rule . . . that a defamatory statement, to be actionable, must be false.").

*Harris* maintains that our courts must avoid entanglement in ecclesiastical matters, doctrine, and practice. *See Harris*, 361 N.C. at 269-75, 643 S.E.2d at 569-72. Not only do we dismiss claims that involve examining or weighing *doctrine*, but we also dismiss claims that involve examining or weighing *ecclesiastical matters*. *Doe*, 242 N.C. App. at 46-58, 776 S.E.2d at 34-41; *see Harris*, 361 N.C. at 270, 643 S.E.2d at 569 ("The constitutional prohibition against court entanglement in ecclesiastical matters is necessary to protect First Amendment rights identified by the 'Establishment Clause' and the 'Free Exercise Clause.'"). As discussed above, ecclesiastical matters go beyond following church scripture or texts, and our precedent has shown the breadth of ecclesiastical matters and church doctrine.

In *Doe*, we distinguished two tort claims that implicated the ecclesiastical entanglement doctrine. On the one hand, we allowed an individual's negligent supervision claim against a diocese and a bishop that stemmed from an alleged sexual assault, reasoning that neutral principles of law permitted adjudicating an individual's claim that the diocese and bishop knew or should have known of the danger posed by the priest to an individual because of his sexual attraction to minors. *Doe*, 242 N.C. App. at 51-55, 776 S.E.2d at 36-39. We concluded there was no need to determine issues such as whether the priest should have been incardinated, allowed

to remain a priest, or whether the priest's relationship with the diocese should have been severed. *Id.* On the other hand, we could not adjudicate the same individual's negligence claim based on defendants' failure to compel the priest to undergo sexually transmitted disease (STD) testing. *Id.* at 56, 776 S.E.2d at 40. We reasoned that the liability theory was premised on tenets of the Catholic church, namely, the degree of control existing in the relationship between the bishop and priest. *Id.*

Our Supreme Court held in *Harris* that a trial court could not judge "the proper role of . . . church officials and whether . . . expenditure[s were] proper in light of . . . religious doctrine and practice." *Harris*, 361 N.C. at 273, 643 S.E.2d at 571. Therefore, "[b]ecause a church's religious doctrine and practice affect its understanding of each of [the concepts at issue], [this is like] asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs," which are barred. *Id.* Religious doctrine permeates a church's understandings of numerous aspects of its religious practice. *See id.*

Various other North Carolina cases inform what is included in the ecclesiastical entanglement doctrine. We held in *Emory* that we could not look into a church's internal customs or practices. *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 493, 598 S.E.2d 667, 670-71 (2004) (barring an examination of informal meeting notice requirements). Yet, in *Azige*, we reaffirmed

that courts may resolve church disputes through neutral principles of property law without necessarily becoming entangled in internal church governance concerning ecclesiastical matters. *Azige v. Holy Trinity Ethiopian Orthodox Tewahdo Church*, 249 N.C. App. 236, 239, 790 S.E.2d 570, 572-73 (2016). Likewise, in *Smith*, we did not have to interpret or weigh doctrine in a negligent retention and supervision claim because the claims merely raised the issue of whether church officials knew or had reason to know of a cleric's propensity to engage in sexual misconduct. *Smith*, 128 N.C. App. at 495, 495 S.E.2d at 398.

United States Supreme Court decisions also support our longstanding aversion for entanglement in ecclesiastical matters. Religious disputes can include "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 49 L. Ed. 2d 151 (1976). Indeed, more than 150 years ago, the United States Supreme Court held that religious disputes could cover "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them . . . ." *Watson v. Jones*, 80 U.S. 679, 733, 20 L. Ed. 666 (1871). "[*Watson*] radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, *free from state interference*, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116, 97 L. Ed. 120 (emphasis added).

Under our precedent and United States Supreme Court precedent, religious doctrine and ecclesiastical matters are expansive. Statements made during religious disputes can include a religion's internal customs, practices, beliefs, faith, theology, morality, membership, organization, governance, rules, law, discipline, and degree of control between members. The nature of speech, and alleged defamatory statements in particular, more easily touch upon these subjects than negligence or property claims. To illustrate, a corporation's communications are riddled with corporate issues and business matters, just as a religion's internal communications are riddled with religious issues and ecclesiastical matters. It is then unlikely that a church's internal communications will be "purely secular." *See Doe*, 242 N.C. App. at 55, 776 S.E.2d at 39 (holding that we have subject matter jurisdiction over an issue when a "claim is a purely secular one" because "[n]eutral principles of law [can] govern th[e] inquiry").

For defamation claims, we must consider whether a statement is true or false without examining or inquiring into ecclesiastical matters or church doctrine. *See Doe*, 242 N.C. App. at 48, 776 S.E.2d at 35. Those matters permeate much of a religion's internal communications, and so it will be a rare occurrence when a religion's internal statements are purely secular. We must remain cautious of deciding the truth or falsity of a religion's internal communications because doing so

risks chilling the religion's "associational conduct" or putting our pen's power "behind a particular religious faction." *See id.* at 48, 776 S.E.2d at 35.

Finally, we cannot favor religions with scripture and disfavor religions without scripture. Religions without authoritative scripture or internal documentation would be more susceptible to defamation claims than those without. We cannot disadvantage religions that lack such texts. Nor can we decide if a religion has sufficiently deep ecclesiastical points of faith and practice compared to others. The First Amendment serves to prevent exactly this sort of picking of winners and losers in ecclesiastical matters.

## B. The Statements

Plaintiffs argue several communications by Defendants were defamatory. For simplicity, we divide analysis of these communications into discrete sets of statements. We hold that determining the falsity of the statements—an essential element of a defamation claim under North Carolina law—would require our courts to examine or inquire into ecclesiastical matters or church doctrine. This is not permitted by the First Amendment or North Carolina precedent. We analyze these communications in turn.

**1. 13 November 2012 Letter**

The first statement Plaintiffs challenge is contained in the 13 November letter addressed from Holleman to Mrs. Lippard and later sent to DHBC's congregation in an expanded form. Plaintiffs primarily challenge the following statement from the letter: "I (we) have yet to hear you [Mrs. Lippard] acknowledge any personal responsibility for your failures." Plaintiffs claim that the statement is false "in that [Mrs.] Lippard ha[d] acknowledged her share of responsibility in the dispute with Hix."

Further context from the 13 November letter shows the ecclesiastical context of the challenged statement. In the 13 November letter, Holleman stated the Deacons's recommendation to dismiss Mrs. Lippard came from the Deacons's belief that "[Mrs. Lippard,] by placing conditions upon [her] obedience to the scriptures as they regard reconciliation, ha[s] been the obstacle to that reconciliation." Holleman stated that, during a reconciliation meeting, he had posed six questions drawn from Ephesians 4 to Mrs. Lippard, with three more direct questions asking her to admit failures in those areas. He continued, saying "it's true you answered 'yes' but you followed that answer three times with the condition of your demand for satisfactory answers from [Hix.] What was evident then was that you had missed the essence of the Biblical text . . . ." Holleman went on to identify four "personal failures" of Mrs. Lippard "that are obviously and Biblically demonstrated as failures or sinful": (1) her immediate response to the song reassignment; (2) that she "failed in [her] continued

resistance to the disciplinary actions of the church," specifically noting that "Hebrews 12:11 exhorts [DHBC members] to be 'exercised' or 'trained' by [the reconciliation process]"; (3) Mrs. Lippard's alleged "slanderous comments about a fellow believer"; and (4) her "implied accusation that [Hix] had intentionally concealed the music for his solo . . . ."

Plaintiffs ask us to determine the truth or falsity of Holleman's claim that he and the Deacons had not heard Mrs. Lippard "acknowledge any personal responsibility for [her] failures." What is apparent from the 13 November letter is that the acknowledgment of personal responsibility Holleman refers to is acknowledgment in the context of reconciliation between persons under biblical doctrine as DHBC understands it. Courts cannot undertake such an inquiry.

To determine whether Mrs. Lippard's conduct constituted an "acknowledge[ment] of personal responsibility" under these conditions would require courts to interpret religious doctrine. Here, the statement at issue is whether Mrs. Lippard acknowledged personal responsibility for her failures. To determine the truth or falsity of that statement, the trial court would have to determine (1) what Mrs. Lippard's "failures" were, in biblical context, and (2) whether Mrs. Lippard's conditional response to the questions asking her to admit failures based on the text of Ephesians 4 was sufficient under DHBC doctrine. We hold the ecclesiastical entanglement doctrine under the First Amendment prohibits this inquiry.

**2. 28 November 2012 Sermon**

Plaintiffs next contend statements Holleman made in a 28 November 2012 sermon delivered to the DHBC congregation were defamatory. Plaintiffs challenge Holleman's statement that "[Mrs. Lippard] had yet to acknowledge any wrongdoing and that this refusal was the basis for the Deacon's [sic] recommendation [to dismiss her as staff church pianist]." They further challenge Holleman preaching that the Deacons's decision was based on Mrs. Lippard's "unwillingness to commit" to DHBC's reconciliation process; that Mrs. Lippard's refusal to accept responsibility "for any possible error was as strong, if not stronger than ever[]"; and that Mrs. Lippard "never conceded to any wrongdoing." Plaintiffs also challenge Holleman's claims that Mrs. Lippard accused Hix of lying and intentionally hiding sheet music and making slanderous comments about a fellow choir member.

The content of the 28 November sermon restates and expands on the 13 November letter and our analysis demands the same result. The record shows that Holleman delivered the challenged statements during a sermon explaining the Deacons and Personnel Committee's decision to recommend Mrs. Lippard's termination as church pianist and advocating for the congregation to approve that termination. Specifically, Holleman describes the sermon and gathering as "a necessary, though infrequent, part of New Testament Church life and ministry," and the attempted "reconciliation process" and recommendation for termination as an

"application of church discipline" and as "follow[ing] the New Testament pattern for church discipline."

At the outset of the 28 November sermon, Holleman taught that the disciplinary process is based on Matthew 18:15-17. Further, as initially stated in the 13 November letter, Holleman's comments throughout the 28 November sermon made clear that his appeal for commitment to the reconciliation process and acceptance of personal responsibility from Mrs. Lippard stems from following Ephesians 4:3. Plaintiffs contend Mrs. Lippard "was always willing to commit to the reconciliation process, having attended all the reconciliation meetings," and that she had acknowledged personal responsibility for her failures because she "had in fact apologized numerous times for any perceived or actual missteps on her behalf." These assertions, however, only illustrate that what is at issue here is not merely a matter of fact, but what constitutes "willingness to commit" to DHBC's reconciliation process and "acceptance of personal responsibility" in accordance with its doctrine.

To evaluate the truth or falsity of these statements, we would need to inquire into religious doctrine and practice. In particular, we would have to decide whether, as Plaintiffs contend, Mrs. Lippard's mere attendance at reconciliation meetings constituted "willingness to participate" in those meetings, and whether her asserted apologies to Hix sufficed for "acceptance of personal responsibility" in the context of DHBC's reconciliation process. Resolving these questions would involve our courts

in determining such essential points of doctrine as what "reconciliation," "wrongdoing," and "acceptance of personal responsibility" mean, which would necessarily involve interpretation of Matthew 18 and Ephesians 4. Courts cannot make such determinations without running afoul of the First Amendment.

**3. Ballot and Absentee Ballot**

Plaintiffs next contend the language of the Ballot and Absentee Ballot ("the ballots") disseminated to the congregation was defamatory. The specific language Plaintiffs challenge, which was identical on the ballots, stated:

> The Deacons & Personnel Committee recommend that [Mrs.] Lippard be immediately dismissed from her duties as church pianist, due to her unwillingness to admit to any wrongdoing, or to commit unconditionally to the process of reconciliation.

Then, "based upon the following three questions," the ballots asked congregants to "render a decision":

> [1]. Have [Mrs. Lippard]'s actions been clearly demonstrated to her and to you as wrong according to the Scriptures?
> [2]. Have the efforts of the Deacons, Personnel Committee and Pastor to restore her into the fellowship of the Body of Christ been sufficiently exercised with careful deliberation, patience, and graciousness, and according to the Scriptures?
> [3]. Has [Mrs. Lippard] responded positively as instructed by the Scriptures?

Plaintiffs' defamation claim based on the language of the ballots, which is similar to statements made by Holleman in the 13 November letter and 28 November sermon,

is barred by the ecclesiastical entanglement doctrine of the First Amendment. To determine the truth or falsity of the claim that Mrs. Lippard was "unwilling[] to admit to any wrongdoing, or to commit unconditionally to the process of reconciliation," we would have to inquire into whether the actions Mrs. Lippard took throughout the reconciliation process comported with DHBC's understanding of the requirements of scripture. The ecclesiastical entanglement doctrine prohibits this inquiry.

**4. Communications by Hix about Mr. Lippard**

Plaintiffs next argue two statements by Hix were defamatory. They contend oral communications made by Hix to an unidentified congregant on 23 December 2012 were defamatory. They also contend an email sent to Brewer, a DHBC choir member, on 8 January 2013 contained a defamatory statement.

Plaintiffs allege that on 23 December 2012, Hix said "[Mr.] Lippard is a liar and you and other people like you are believing him instead of Scripture."[3] Without conceding the statement was made, Defendants contend the statement "was made in the context of Hix's interpretation of and Mr. Lippard's compliance with scripture." Therefore, Defendants argue, "[a]n inquiry into the falsity of the statement would require a comparison of Mr. Lippard's conduct with Scripture, which also prohibits lying." We presume "people like [Brewer]" refers to other DHBC members who

---

[3] We cannot separate the 23 December 2012 statement into two parts and must read it as a whole because it is a complete sentence without a comma that would indicate a compound sentence of two thoughts.

support Plaintiffs. To decide whether Mr. Lippard lied and if people like Brewer believed Mr. Lippard instead of DHBC's interpretation of scripture, we would need to inquire into DHBC's definition of lying, when to believe scripture, and how scripture determines whom to believe. This is an issue over DHBC's internal customs, practices, morality, and degree of control between members. It cannot be said that this statement is purely secular. Analyzing the truth or falsity of this statement would require us to assess whether the alleged words or deeds comport with or contravene the teachings of scripture regarding lying and DHBC's interpretation of it, an inquiry prohibited by the First Amendment.

Plaintiffs also contend the following statement from an 8 January 2013 email to Brewer is defamatory: "Note that there are verifiable facts and Biblical scriptures which [Plaintiffs] are openly denying and defying." Defendants again argue that "[a]n inquiry into the falsity of the statement would require a comparison of [Plaintiffs'] conduct with Scripture and whether they were openly denying and defying the Scripture." As we discussed above regarding the 13 November 2012 letter, Plaintiffs ask us to determine the truth or falsity of Hix's claim that Plaintiffs were "openly denying and defying" "verifiable facts and Biblical scriptures."

This statement arose when Brewer was concerned that "taking anyone off the [Special Music] schedule" was an inappropriate "form of discipline in a church setting." Hix replied, in part, that

> [Brewer] might want to look closely and note that while [Mrs. Lippard] and [Mr. Lippard] were removed from the Special Music schedule, that I also removed myself from that rotation. *Note also that there are verifiable facts and Biblical scriptures which they are openly denying and defying.* Those facts and scriptures still stand. The church vote allowed [Mrs. Lippard] to keep her position as pianist, but it did not answer the biblical appeal for reconciliation. That appeal was extended by 17 out of 18 of our senior church leaders. Until [Mr. Lippard] and [Mrs. Lippard] are prepared to respond to the appeal which was, has been, and continues to be extended in biblical love, it would not be appropriate to restore them to a position of leading worship within the church.

For many, music is worship as it is a celebration of faith and often a time of prayer. Confirming the veracity of Hix's claim would require us to inquire into and examine DHBC's internal discipline process, biblical appeals for reconciliation, and Hix's ability to direct and control the members of DHBC's music organization. Hix's assessment of whether Plaintiffs are "openly defying" "verifiable facts and Biblical scriptures" directly informed his decision of whether "it would . . . be appropriate to restore them to a position of leading worship within [DHBC]." Further, an inquiry into the falsity of whether Plaintiffs were "openly denying and defying" "verifiable facts and Biblical scriptures" would also, again, require us to examine DHBC's customs and practices relating to the biblically-based reconciliation process. The ecclesiastical entanglement doctrine under the First Amendment prohibits this inquiry as well.

**5. Communications by Holleman about Plaintiffs to his Congregation**

Plaintiffs next contend statements made by Holleman to various church members regarding Plaintiffs were defamatory. Specifically, Plaintiffs cite a 16 January 2013 letter from Holleman to Brewer, a 6 April 2013 email from Holleman to Brewer, and a 25 April 2013 email to Myers.

**a. 16 January 2013 Letter**

Plaintiffs allege that a litany of excerpts from the 16 January letter were defamatory. Among others, Plaintiffs claim the following statements made by Holleman were defamatory: (1) "I was not exaggerating when I said to the church that [Plaintiffs] have been confronted with appeals for reconciliation 26 times since 2010[]"; (2) "Obviously, [Mrs. Lippard] is not required to do these things [(i.e., voluntary service to the church)] as a part of her job description but if there was an eagerness to serve as a staff member and a joyful participant in the ministry of [DHBC], it seems that she might find a place of service[]"; (3) "I can't imagine why [Mrs. Lippard] would have been resistant to the idea [of voluntary service] to this day, but that resistance certainly doesn't communicate a spirit of willingness and cooperation"; (4) "[Mrs. Lippard is] the present obstacle to reconciliation between her and [Hix]"; and (5) "No doubt there are more strategies against the church leadership playing out tonight."

Analyzing the falsity of excerpts (1)-(4) would require us to interpret or weigh DHBC's interpretation of scripture and doctrine. For example, in determining

whether it is true that "[Plaintiffs] have been confronted with appeals for reconciliation 26 times," we would have to determine what constitutes an appeal for reconciliation within DHBC. Whether Mrs. Lippard was a "joyful participant in the ministry of the church" and had "a spirit of willingness and cooperation" ultimately turn on the meaning of those terms within DHBC membership and doctrine. Finally, determining the falsity of Holleman's identification of Mrs. Lippard as "the present obstacle to reconciliation between her and [Hix]" would again require us to interpret the reconciliation process and the responsibilities of participants according to scripture as interpreted by DHBC. Each of these examinations would cross the ecclesiastical boundary line under the First Amendment.

The fifth excerpt that "there are more strategies against the church leadership playing out tonight" does not directly invoke scripture, but it does involve other ecclesiastical matters.[4] The excerpted statement arose in the midst of Holleman explaining, to a member of his congregation, his thoughts on the ongoing dispute, controversy, conversations, confrontations, and involvement of fellow DHBC members:

> I am in heartfelt agreement with you here [that the "back-and-forth" must stop]. Since the vote, the only action taken by the church leadership has been to delay [the Lippards'] reinstatement into the solo rotation. I've given our reasons above. While I can't speak for every member, as far as I'm aware, every new conversation or controversy has been

---

[4] We note scriptural interpretations of this phrase are possible, but Defendants do not make any such argument on appeal.

initiated by [the Lippards], or by those who have been advocating for their position. You yourself have attempted to engage me in conversation at the church. You have asked to speak with James Orbison. And now you've written this letter and had it delivered to me, Bryan Sherrill, and Bill Wooten. [Mr. Lippard] has confronted [Hix] multiple times, and this very day, I've met with Billy Lynch for breakfast, whom [Mr. Lippard] had confronted at Church with a copy of Alan's directives to [Mrs. Lippard]. I've learned that [Mr. Lippard] has e-mailed [Hix] requesting an explanation for why he and [Mrs. Lippard] have not been returned to the solo rotation. And Bryan Sherrill indicates that [Mr. Lippard] called him today attempting to "catch" me in some mistake. These are just a few. *No doubt there are more strategies against the church leadership playing out tonight.* The only time I or the church leadership have engaged in further conversation has been when we have been compelled to answer publicly some charge of wrong doing. You claim that you want the back-and-forth to stop yet here I am, a month after the church vote, writing out an answer to your uninformed accusations of our mishandling of the past issues, while [Hix] and Bryan are fielding additional complaints and accusations from [Mr. Lippard]. It would seem that in large part the back-and-forth ceasing is up to you and [Mr. Lippard]. For my part, you are reading what is at least near to being my last word on the matter. As to your accusation that "Someone, mainly [Hix], wants [Mrs. Lippard] off the piano." Short of making a motion for [Mrs. Lippard's] dismissal from the fellowship of the church, what disciplinary action would you have suggested? I think the Deacons brought the best recommendation they could bring that would communicate to [the Lippards] the seriousness of an irreconcilable spirt while also providing grace and room for their appropriate response. I doubt that they would have been any less enraged by a suspension, given the fact that [Mr. Lippard] rejected my offer that he and [Mrs. Lippard] might, like [Hix], take a leave of absence until the matter could be resolved. Your accusation that "mainly" [Hix] wanted [Mrs. Lippard]

removed from the piano, says more about you [sic] personal opinion of [Hix] than it does about the reality of the issue. I'm sure that [Hix's] attempts at trying to find a way to work with [Mrs. Lippard] have been a source of frustration for him over the years, but never has he indicated in the slightest that her removal was the solution. [Hix] recognized early on that the roots of their contentious relationship were primarily in [Mrs. Lippard's] personal dislike of him. His willingness to participate in the series of meetings I had with them was evidence of his desire to address those roots and to make whatever adjustments were needed to better their relationship. Having presided over those meetings, I am convinced that he [sic] effort was sincere. To summarize, nothing in [Hix's] behavior over the past several months would support your claim that his (or our) aim has been [Mrs. Lippard's] removal as church pianist.

This quote itself is excerpted from a 13-page pastoral letter. The letter is a formal "Pastoral Response" to a complaint filed by a member of the church. The letter and the complaint "regard[] [Mrs.] Lippard" and her "recent disciplinary action." The letter concludes that "God Himself will be the judge of this and while I hope that men will know my heart, I cannot ultimately be persuaded of my rightness or wrongness by their Biblically unsubstantiated opinions alone."

Plainly, this controversy and ongoing dispute with the Plaintiffs is a matter of DHBC's internal membership, organization, governance, discipline, and degree of control between members. We cannot decide the rightness or wrongness of this statement by a pastor communicating with his flock.

**b. 6 April 2013 Email**

Plaintiffs also contend Holleman defamed them in a 6 April email to Brewer. In the email, Holleman stated:

> There were several there the Wednesday night that [Mr. Lippard], with [Mrs. Lippard] behind him, blocked [Hix's] exit from the music room and was aggressively going after [Hix], pointing his finger in [Hix's] face, an action I recently learned was illegal and could have very well been reported as a crime.

This excerpted statement does not directly involve scripture, but it does involve DHBC's customs, doctrine, and practice regarding membership and member conduct. This accusatory excerpt was made in the midst of an extensive multi-page email chain that contains several references to scripture and discusses DHBC and Holleman's handling of the dispute:[5]

> [Header of the 6 April 2013 9:07 AM email from Brewer to Holleman.]
>
> Hi [Holleman,]
>
> I guess due to you not replying to the last E-Mail, you disagree with having a meeting with [Mrs. Lippard] and [Mr. Lippard].
>
> I am very saddened[.] Could it be that they were wronged and have additional information to prove it[?] Could it be that others should also be present at a meeting to address their part of the issues[?] Could it be that you and the committ[e]es were totally right[?] By giving them an additional meeting[,] could [it] settle the whole matter or not[?] There is everything to gain and nothing to lo[]se. Is

---

[5] Alterations to the email chain include adjusting the names of the parties for consistency, removing extraneous spacing and parentheses, adding paragraph breaks, and correcting some grammatical and spelling errors.

everything better now by not giving them additional attention or not?  When I was the[re] last[, DHBC] members were going around telling other members not to speak to [Mr. Lippard].

Is this Christian actions[?] By not giving them the needed attention they deserve[?]  You, committee members and others should give them an apology for the way things were handled.  You know yourself that [Mr. Lippard] was only protecting his wife and trying to get someone[’s] attenti[on] about setting up a meeting and settling the Issues!

[Holleman] I have been very concerned about your ministry and would not want anything to hinder that[.]  Also[,] I always try to think of [DHBC] and ways [to] prevent conflict.  [DHBC] has been through many Issues in the past.  Mostly petty issues which t[ea]r the cong[r]e[g]ation apart[.]  WE should learn from our mistakes[.]

However[,] it appears that we don’t always.  That’s also partially why our membership does not grow.  I trust that everyone will do what[’]s right through this conflict by showing love and concern for all, even through conflicts.

Signed[,]

[Brewer]

[Header of the 6 April 2013 5:25 PM email by Holleman replying to Brewer.]

I didn’t respond because you wrote that you had said all you wanted on the matter.  My assumption was that you had also heard all you wanted.

You’re correct in assuming that I and the Deacons, and the Personnel Committee will not provide another meeting with [Mr. Lippard] and [Mrs. Lippard].  We have had 5 meetings with [Mr. Lippard] and [Mrs. Lippard] and if you count the [DHBC]-wide meeting, they’ve had no fewer than 6 opportunities to ask their questions.  In each of these

meetings we have answered their questions along with numerous times in one on one conversations.

The Deacons have indicated to [Mr. Lippard] that if he wanted to have a conversation about reconciliation, we would be happy to have that conversation. We will not provide [Mr. Lippard] with a public platform to make accusations against [Hix] or the leadership which he cannot give evidence for beyond his own suspicions. I Timothy 5:19 says, "Receive not an accusation against an elder without two or three witnesses." True, [DHBC] doesn't elect elders, but leaders serve the same function, particularly staff members. How would you like it if a single person came to me and demanded a church meeting to publicly accuse you of all kinds of things without having a single substantial piece of evidence or a witness to validate those accusations? Would you be so eager for that meeting? I think not.

So then your suggestion that we abandon the Biblical instruction and "give [Mr. Lippard] all the meetings he wants" to make all the accusations he wants certainly does not have the good and health of [DHBC] in mind. You are advocating for [Mr. Lippard]'s desire to do what the scriptures forbid. I am certain that if [Mr. Lippard] had any substantial evidence to validate any of his claims, we would have been informed by now via phone call, E-mail, or personal contact. He certainly has not been reluctant to raise his "points" thus far.

I would add that you continue to refer to "others being in a meeting." I'm at a loss to understand why you and [Mr. Lippard] cannot seem to understand that [Hix] hasn't been a part of the discussions since August 22, 2012? We've not been defending [Hix], or his actions past or present, yet every time you send an e-mail or every time [Mr. Lippard] confronts someone, it involves [Hix]. The actions of the Leadership and 59% of [DHBC] are not a vindication of [Hix] or his actions, they are simply the actions resulting from [Mr. Lippard] & [Mrs. Lippard]'s refusal to yield to what the Word of God says.

I very much protest your implied accusation that [Mr. Lippard] has some information that we are trying to suppress by not allowing him to have a meeting. I think seven months of meetings and discussions is ample, in fact abundant, time for him to have brought such evidence forward.

Your opinion is getting pretty clear. You obviously agree with [Mr. Lippard] that we or (I) have not acted Biblically or in a Christian manner towards [Mr. Lippard] and [Mrs. Lippard]. If that's true then I ask that you provide some evidence of that beyond your own opinion. Otherwise you are very close to becoming a false witness against those who are called to lead [DHBC] according to God's word. (Ephesians 4:11-12)

An additional meeting will not settle the whole matter, because the "matter" to be settled is whether or not [Mr. Lippard] and [Mrs. Lippard] are going to obey God and the scriptures. They have refused to yield from the beginning to the Word of God. I am exhausted with trying to explain that to you, and your continuing advocacy for [Mr. Lippard] and [Mrs. Lippard] have made it increasingly difficult for us to keep directing their attention to the Biblical injunction to be reconciled. Your encouraging them and lending a sympathetic ear, have only deepened their resolve to reject our appeals and while you think yourself to have been acting in a Christian manner toward them, you have actually (unwittingly or not) contributed to pushing them farther away from the Lord and the true peace that might have been, and still may be, found in Him.

That [Mr. Lippard] and [Mrs. Lippard] are out of fellowship with God and [DHBC] is painfully evident in the methods they are employing against the leadership of [DHBC]. I can't tell you how many times [Mr. Lippard] has twisted my words to make them say something to fit his agenda. He even claimed that I admitted to him that "I framed him and [Mrs. Lippard] with the August 22nd meeting." Absurd! He always fails to inform folks that I was very explicit with the conditions set for the meeting, days before,

at the start, and again at the conclusion of that meeting. [Mr. Lippard] agreed to those conditions, and even admitted later that he did so because he knew that it was the only way he could get a face to face meeting with [Hix].

I ask you[: W]ho was being dishonest there?   I was completely straightforward and transparent about the nature of that [Wednesday] meeting [on 22 August 2012], and he agreed only so that he could conceal his true motive. That should tell you that [Mr. Lippard] and [Mrs. Lippard] did not come into that meeting seeking reconciliation as was the stated purpose, but to confront [Hix] with their accusations.   And accuse they did!   [Mr. Lippard] finally just interrupted me bluntly, dismissed the scripture I had used, and demanded of [Hix] an explanation for the song reassignment.   [Hix] answered and that didn't satisfy them and [Mr. Lippard] and [Mrs. Lippard] immediately went after him.   At that point, as indicated to them beforehand, I ended the meeting and informed them that matter would follow the Matthew 18 mandate.   There were witnesses there to confirm everything I've said about that [Wednesday] meeting.

No person in leadership has endorsed anything less than respectful behavior toward [Mr. Lippard] and [Mrs. Lippard].   If there are members, leadership and otherwise who have who have refused to speak to [Mr. Lippard] and [Mrs. Lippard], they have not done so at my request.   I have been cordial and respectful to [Mr. Lippard] and [Mrs. Lippard], prior to the church vote and following it.

If folks have been standoffish, it might have something to do with [Mr. Lippard] and [Mrs. Lippard]'s behavior.   Some folks have witnessed their confrontations.   *There were several there the Wednesday night that [Mr. Lippard], with [Mrs. Lippard behind him, blocked [Hix]'s exit from the music room and was aggressively going after [Hix], pointing his finger in [Hix]'s face, an action I recently learned was illegal and could have very well been reported as a crime.* (emphasis added).

Add to these the numerous "parking lot" confrontations, and angry telephone calls, and it might at least explain why some folks are avoiding them. I'm not suggesting that this is the right response, but you make it sound as though the folks that are "shunning" them are doing so without any provocation at all. To be honest with you, there are a few that are even frightened by [Mr. Lippard]'s aggressiveness, and I've told him this. Having said this, I would say that the withholding of full fellowship from a rebellious and disobedient (To the Scriptures) believer has Biblical precedent (2 Thessalonians 3:14-15; Romans 16:17-18).

For this reason, while I have tried to speak to [Mr. Lippard] and [Mrs. Lippard] at every opportunity, and be respectful and cordial, I have not treated them in such a way as to imply or suggest to them that they have been restored to full fellowship with [DHBC]. They cannot reject the Word of God and refuse to be reconciled to their brothers and still enjoy a proper fellowship with God and it is wrong and unloving to treat them in such a way as to obscure that reality. If the Lord brings to mind by the Holy Spirit or through His word that I have wronged or acted wrongly toward [Mr. Lippard] and [Mrs. Lippard] or anyone else, you can be assured that I will make that right without delay. But as I've said to you multiple times already, if you or [Mr. Lippard] and [Mrs. Lippard] can demonstrate <u>Biblically</u> that this issue <u>has been mishandled</u> or that grace and mercy and the humility of Galatians 6:1 has been omitted, I will gladly apologize.

Did you know that I have submitted for the review of four fellow Pastors, a written account of every action we've taken and every decision I've personally made, including all the arguments that [Mr. Lippard] and others have raised[?] [A]nd do you know that they have not discovered a single error in our handling of it, and in fact have commended the [DHBC] leadership for the thoroughness and Biblical consistency with which they've navigated through this issue[?] Obviously God will be the final judge, but I find great encouragement that four of my mentors,

Pastors who have been in the ministry for years, have said that they weren't sure that they would have "handled" it as well.

For this grace, I am deeply grateful to God. I have spent hours agonizing over decisions and the words with which I should convey them, and in my flesh, I would have surely failed miserably, but all the while, God was impressing me to just follow the Word. With His grace, and to His glory, that's exactly what we've done. I am content if we have been pleasing to Him. You may have been concerned about me personally, but I don't think you have been concerned about "the ministry to which God has called me." In fact, I don't think you really understand that ministry.

For me, church is not merely a background scene in front of which I live my life. I'm not just pulpit furniture that just happens to be in place each Sunday morning, Sunday night, and Wednesday. When I stand in that Pulpit, I feel the weight of the responsibility to "rightly divide the Word." There is an urgency in my heart that almost makes me feel as though if I don't preach in such a way as to display the glory of Christ, I will have utterly failed. There's a desperation in my heart that everyone present might see that we don't just have a religious book in our hands but the very word and voice of God Almighty. You may think that my aim is to "keep the peace," but you forget that the Lord Himself said, "Think not that I have come to bring peace on the earth, but a sword…." (Matthew 10:34-39).

Oh don't misunderstand, I'm a peace lover too. By nature I'm not confrontational at all. But I will not settle for a superficial peace that continues to allow sin to fester and grow under the surface, only to erupt at the slightest "petty" disagreement, and I'm fully aware that that position will not be appreciated by all. Jesus said as much, if you'll read the entire reference mentioned above (Mat. 10:34-39)[.]

You're right, [DHBC] in large part has not learned from its past mistakes and one of those mistakes has been to avoid confrontation when it was actually confrontation that was needed to expose the root that caused it. (1 Corinthians 11:18-19) Equally contributing to that error is the unbiblical idea of the church as a collection of individuals, completely without accountability. We've adopted an Americanized Christianity that has everyone as independent and self-determining lone-rangers. Did you know that nothing could be farther from the Bible? What [DHBC] has never learned is that without willful submission to becoming accountable to God and other believers, the intimacy that everyone claims to want and enjoy is impossible. So resistant are we to the ideal of humble submission and willful vulnerability that we've decided that we would settle for a shallow, soon to be broken, intimacy. I suspect that [DHBC] has settled for that for so many years that they've began to think that's the norm. It's not…I assure you!

The Lord can change that though, and I think that's what He might be up to in all of the last seven months. The question I suppose is this: "will I, will you, will [Mr. Lippard] and [Mrs. Lippard], will [DHBC] trust God enough to simply obey Him? Will we wait for him to lead us through the darkness of this present valley, believing with our whole heart that there's a bright meadow on the other side?["]

This may be more than you can digest in one reading, but I don't think I need to say much more than this. No, I absolutely don't agree with you on multiple Biblical grounds, but the increasingly antagonistic and accusatory tone of your e-mails suggest to me that I'm alienating you ever farther and since that makes no sense and is not ultimately helpful, I'll just leave things as they are.

I would add one more question. With the exception of my leaving the jobsite angrily many years ago, [i]n the 28 years you have known me and in the 7 years I've served as Pastor at [DHBC], have you observed anything in my character

that would suggest to you that I would have acted as maliciously in this issue as [Mr. Lippard] has undoubtedly portrayed me to you and others? [I]f not, I can't understand how you would so quickly attribute to me the character he suggests.

If I have in fact acted as treacherously and deceitfully as [Mr. Lippard] would have you believe, there is a constitutional recourse available to you and [Mr. Lippard]. You can develop and circulate a petition for my dismissal as Pastor. You can force a motion before [DHBC] with a petition signed by 25% of the membership and [DHBC] will be forced to vote on the matter.

To be honest, if I am guilty of what [Mr. Lippard] charges me with and what you suspect me of, you would be well within your Christian duty to do exactly that.

Respectfully and Prayerfully,

Larry

[Header of the 6 April 2013 6:45 PM email from Brewer to Holleman.]

Hi [Holleman,]

I know that the committee members were addressing [Mrs. Lippard] only, I knew that then[.] However[, Hix] was [a part] of the conflict with the song and as Director. This part is my real issue. I have had issues with [Hix] before and believe there [is] more to it. [N]o one is perfect[.] [H]owever[, Hix] should be willing to address their issues. That may be why they want another meeting. Another meeting can[']t hurt and may settle it all. No reply necessary[.]

[Brewer]

[Header of the 7 April 2013 email from Brewer to Holleman.]

I was thinking about the letter overnight. I think how ironic you twist and turn things around and now blaming me. I guess I am to blame for at least one thing[—s]howing concern[.]

Let me ask you this[, d]id [Mrs. Lippard] agree to go through reconciliation about the issues 2 1/2 years ago and did you say things were going well[?] Did you say that you were going to recommend to the [D]eacons to drop the issues[?] If that is the case, why was that reinstated as a problem[?] I have said in the beginning that [Hix] should be at the meeting on Wednesday night in question. The song issue has not been settled. Until [Hix] is willing to meet with [Mrs. Lippard] and [Mr. Lippard] and settle their issues. There is no reconciliation. I don't know what they wanted to discuss in a meeting[.] But[,] I think another meeting is necessary. If [Hix] had been present at the Wednesday night meeting in question, things could have been possibly settled. I never intended to question your abilities[.] Only to grab your attention[.] I would not want you to lo[]se your job over this. Also[, i]t bothers me big time that this can and does affect [DHBC] membership. We must handle issues above board as quickly as possible.

Sign

[Brewer]

Reply

As in *Harris*, we would be forced to determine whether the statement at issue is proper in light of DHBC's customs, doctrine, and practice regarding membership and conduct. The statement arose from Holleman's observations of how "folks" in the church "have been standoffish" and "have witnessed [Plaintiffs'] confrontations." The email's language, after the statement, explicitly discusses that "withholding of full fellowship from a rebellious and disobedient (To the Scriptures) believer has Biblical

precedent (2 Thessalonians 3:14-15; Romans 16:17-18)." Looking into DHBC's membership governance and how it should react to what it considers improper conduct would require examining church customs, doctrine, and practice.

**c. 25 April 2013 Letter**

Finally, Plaintiffs contend Holleman defamed them in the 25 April letter to Mr. Myers. Specifically, Plaintiffs challenge Holleman's statement that "[Hix] indicated his willingness to acknowledge his own failures and ask forgiveness. [Mrs. Lippard] did not!" They argue that statement is false because "[Mrs. Lippard] apologized to Hix several times, even in writing, for any perceived or actual missteps on her behalf." As in the 28 November 2012 sermon discussed above, we are barred from evaluating this statement under the ecclesiastical entanglement doctrine because, in determining the truth or falsity of the claim that Mrs. Lippard did not "acknowledge [her] own failures and ask forgiveness," we would have to interpret and weigh DHBC doctrine to determine what constitutes "acknowledgement" of failures and "ask[ing] forgiveness" as part of DHBC's process of reconciliation. Therefore, analysis of this statement is barred by the First Amendment.

None of the statements at issue here are purely secular, but we can imagine scenarios where members of a religion make defamatory statements wholly apart from religion. Churchgoers could make defamatory statements against one another outside their religious lives and instead in their personal, business, academic, or

other aspects of their temporal existence. But the statements at issue here were made between members of the same congregation—including its pastor—about an internal dispute regarding ecclesiastical matters. All the statements before us would unconstitutionally require examining or interpreting ecclesiastical matters or religious doctrine, and we may not do so under the First Amendment or the North Carolina Constitution.

## **CONCLUSION**

Plaintiffs appeal the trial court's grant of summary judgment and argue several errors. We affirm the trial court's order on the ground that all statements Plaintiffs challenge are barred by the ecclesiastical entanglement doctrine. Having determined all of Plaintiffs' claims on this ground, we do not address Plaintiffs' remaining challenges.

AFFIRMED.

Judge BERGER concurs.

Chief Judge MCGEE concurs in part, dissents in part, and concurs in the judgment in a separate opinion.

No. COA18-873 – *Lippard v. Holleman*

McGEE, Chief Judge, concurring in part, dissenting in part, and concurring in the judgment.

I disagree with the majority that the ecclesiastical entanglement doctrine under the Establishment Clause and Free Exercise Clause of the First Amendment and Article I, Section 13 of the Constitution of North Carolina bars the courts of our state from considering defamation claims as to all the alleged statements challenged by Plaintiffs in the present case. I would hold that some of the claims at issue are barred by the ecclesiastical entanglement doctrine; however, four others are not.

I. Summary

In determining whether the ecclesiastical entanglement doctrine bars the courts of our state from considering an issue, the fundamental question is "whether resolution of the legal claim requires the court to interpret or weigh church doctrine." *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398, *appeal dismissed*, 348 N.C. 284, 501 S.E.2d 913 (1998) (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 49 L.Ed.2d 151, 163 (1976)). In the context of a defamation claim, which in North Carolina as in other states includes as an essential element the falsity of the statement made, whether courts may apply neutral principles to resolve the claim depends on whether determining the truth or falsity of the allegedly defamatory statement "requires the court to interpret or weigh church doctrine." Although the majority applies this test correctly in some places, in others it expands this analysis by holding that courts are barred from analyzing defamation claims

where they arise out of "matter[s] of [] internal membership, organization, governance, discipline, and degree of control between members[,]" even when the allegedly defamatory statements do not on their face address those topics and determining the truth or falsity of those statements would not require our courts to pass upon ecclesiastical issues, such as where one party accuses another of a crime, or of lying about "verifiable facts." The majority's reading is at odds with precedent in this state and would "go beyond First Amendment protection and cloak [religious] bodies with an exclusive immunity greater than that required for the preservation of the principles constitutionally safeguarded," *Smith*, 128 N.C. App. at 495, 495 S.E.2d at 398 (citation omitted), effectively prohibiting recovery by those harmed by tortfeasors on the basis of the victims' religious affiliation.[6]

In the case of defamation claims, I would hold that courts must evaluate the specific elements of the claim, including the falsity of the alleged statement, and determine whether "resolution of [the truth or falsity of the alleged statement] requires the court to interpret or weigh church doctrine. If not, the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim." *Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398. Based on this analysis, I concur with the majority's holding for some of Plaintiffs' defamation claims that they

---

[6] *See* N.C. Const. Art. I, sec. 18 ("every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law[.]"); *id.* Art. I, sec. 19 ("No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of . . . religion . . . .").

are barred because resolving the claims would require courts to interpret or weigh church doctrine. For four allegedly defamatory statements discussed below, however, I disagree and would hold that there is no need for the court to interpret or weigh church doctrine in its adjudication of the truth or falsity of these claims. Therefore, I dissent in part.

For the claims that I would hold are not barred by the ecclesiastical entanglement doctrine, I would nevertheless hold that Plaintiffs have not shown sufficient evidence for libel *per se* or special damages as required for libel or slander *per quod*. Therefore, I concur in the majority's judgment affirming the trial court's grant of summary judgment for Defendants.

## II. Analysis

The Establishment Clause and Free Exercise Clause of the First Amendment and Article I, Section 13 of the North Carolina Constitution prohibit civil courts "from becoming entangled in ecclesiastical matters." *Doe v. Diocese of Raleigh*, 242 N.C. App. 42, 47, 776 S.E.2d 29, 35 (2015) (citation omitted); *see Harris v. Matthews*, 361 N.C. 265, 270, 643 S.E.2d 566, 569 (2007) ("The constitutional prohibition against court entanglement in ecclesiastical matters is necessary to protect First Amendment rights identified by the 'Establishment Clause' and the 'Free Exercise Clause.'" (citation omitted)). Our Supreme Court has long defined an "ecclesiastical matter" as

> one which concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church; and all such matters are within the province of church courts and their decisions will be respected by civil tribunals.

*E. Conference of Original Free Will Baptists of N.C. v. Piner*, 267 N.C. 74, 77, 147 S.E.2d 581, 583 (1966) (citation and quotation marks omitted), *overruled in part on other grounds by Atkins v. Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973).

In the present case, however, Plaintiffs challenge neither the "adoption and enforcement within a religious association of needful laws and regulations for the government of membership," nor DHBC's "power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church."[7]  Whether ecclesiastical matters are implicated in Plaintiffs' claims for defamation in the present case turns on whether the claims "concern doctrine, creed, or form of worship of the church."

"The dispositive question" in determining whether a court is barred from deciding a cause of action because it would become entangled in ecclesiastical matters

---

[7] In a previous case this Court held the same plaintiffs were barred from doing so. *See Lippard v. Diamond Hill Baptist Church*, ___ N.C. App. ___, ___, 821 S.E.2d 246, 249 (2018) (holding plaintiffs' claim they were improperly excluded from church even though they did not "take any action to have themselves removed from church membership" was ecclesiastical matter under above definitions) (citation omitted).

"is whether resolution of the legal claim requires the court to interpret or weigh church doctrine. If not, the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim." *Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398 (citing *Milivojevich*, 426 U.S. at 710, 49 L.Ed.2d at 163). The application of the ecclesiastical entanglement doctrine to defamation claims is a question of first impression in North Carolina and our precedents delineate the contours of the ecclesiastical entanglement doctrine and are applicable here.

A. North Carolina Caselaw on Ecclesiastical Entanglement Doctrine

In *Atkins v. Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973), which this Court described as the "seminal case" on the ecclesiastical entanglement doctrine in *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 493-94, 598 S.E.2d 667, 671 (2004), a dissenting faction of a Baptist church filed a complaint against members of the church and the pastor seeking a declaration that the plaintiffs were the "true congregation," that the pastor-defendant "be restrained from continuing to act as its pastor" and that the defendants be required to surrender the church property to the plaintiffs. *Walker,* 284 N.C. at 307, 200 S.E.2d at 642. The complaint alleged that a division had arisen in the congregation and the plaintiffs remained faithful to the previous doctrines and practices of the church while the defendants had departed from those doctrines and practices. *Id.* at 307, 200 S.E.2d at 643. The trial court submitted questions to the jury asking it to determine (1)

whether plaintiffs remained faithful to the doctrines and practices of the church as previously practiced and (2) whether the defendants "departed radically and fundamentally from the characteristic usages, customs, doctrines and practices of the [church.]" *Id.* at 308, 200 S.E.2d at 643.

Our Supreme Court applied the Supreme Court of the United States' decision in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 21 L.Ed.2d 658 (1969), reasoning that "questions must be resolved on the basis of [neutral] principles of law"—principles "developed for use in all property disputes." *Id.* at 319, 200 S.E.2d at 650 (citation omitted). For example, courts could determine "(1) [w]ho constitutes the governing body of this particular [] church, and (2) who has that governing body determined to be entitled to use the properties." In contrast, the First Amendment and Article I, Section 13 of the Constitution of North Carolina prohibit a decision of property rights based on "a judicial determination that one group of claimants has adhered faithfully to the fundamental faiths, doctrines and practices of the church . . . while the other group of claimants has departed substantially therefrom." *Id.* at 318, 200 S.E.2d at 649. Although our Supreme Court noted that the plaintiffs could have prevailed "by showing that such action was not taken in a meeting duly called and conducted according to the procedures of the church," *id.* at 320, 200 S.E.2d at 651, it concluded there was no evidence in the record to support such assertion and the trial court's

opinion must have been based on an inquiry barred by the ecclesiastical entanglement doctrine. *Id.* at 321, 200 S.E.2d at 651.

Notably, *Atkins* does not bar all inquiries in disputes over church property merely because the property is church property, the parties are religious members and organizations, or the dispute arose in a religious context. Rather, our Supreme Court held that "[i]t nevertheless remains the duty of civil courts to determine controversies concerning property rights over which such courts have jurisdiction and which are properly brought before them[.]" *Id.* at 318, 200 S.E.2d at 649. Relying on *Presbyterian*, our Supreme Court stated that "[n]either the First Amendment to the Constitution of the United States nor the comparable provision in Article I, Section 13, of the Constitution of North Carolina deprives those entitled to the use and control of church property of protections afforded by government to all property owners alike, such as . . . access to the courts for the determination of contract and property rights." *Id.* at 318, 200 S.E.2d at 649. In conclusion, "[w]here civil, contract[,] or property rights are involved, the courts will inquire as to whether the church tribunal acted within the scope of its authority and observed its own organic form and rules." *Id.* at 320, 200 S.E.2d at 650 (quoting *W. Conference of Original Free Will Baptists v. Creech*, 256 N.C. 128, 140-41, 123 S.E.2d 619, 627 (1962)).

In *Harris v. Matthews*, our Supreme Court reaffirmed the principles of *Atkins* and applied them to a new cause of action—a claim for breach of fiduciary duty by a

7

minority faction of a congregational church against the pastor, secretary, and chair of the board of trustees, based on the allegation that the pastor-defendant "ha[d] usurped the governmental authority of the church's internal governing body." *Harris*, 361 N.C. at 272, 643 S.E.2d at 571. The Supreme Court noted that the plaintiffs claimed the defendants breached their fiduciary duty "by improperly using church funds, which constitutes conversion." *Id.* at 273, 643 S.E.2d at 571. Our Supreme Court held that the issue of whether the expenditures were proper could not be resolved by neutral principles of law because "[d]etermining whether actions, including expenditures, by a church's pastor, secretary, and chairman of the Board of Trustees were proper requires an examination of the church's view of the role of the pastor, staff, and church leaders, their authority and compensation, and church management[,]" and "[b]ecause a church's religious doctrine and practice affects its understanding of each of these concepts[.]" *Id.* at 273, 643 S.E.2d at 571. Although the ecclesiastical entanglement doctrine barred the claim at issue, the *Harris* Court reaffirmed that "[w]here civil, contract[,] or property rights are involved, the courts will inquire as to whether the church tribunal acted within the scope of its authority and observed its own organic forms and rules." *Id.* at 274-75, 643 S.E.2d at 572 (citation omitted).

This Court has applied the principles of the ecclesiastical entanglement doctrine in *Atkins* and *Harris* to other causes of action and clarified the test for

8

whether the ecclesiastical entanglement doctrine will bar courts from considering a claim. In the leading case of *Smith v. Privette*, the plaintiffs, former church employees, sued a United Methodist Church, the District of the North Carolina Conference of the United Methodist Church, and the North Carolina Conference of the United Methodist Church (together, "church defendants"), alleging claims for negligent retention and supervision based on sexual misconduct by a pastor against the employees. Reversing the trial court, this Court held the ecclesiastical entanglement doctrine under the First Amendment did not bar courts from deciding the negligent retention and supervision claims. *Smith*, 128 N.C. App. at 495, 495 S.E.2d at 398. This Court held that, in determining whether the ecclesiastical entanglement doctrine would bar a claim, it must answer "the dispositive question" of "whether resolution of the legal claim requires the court to interpret or weigh church doctrine. If not, the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim." *Id.* at 494, 495 S.E.2d at 398 (citing *Milivojevich*, 426 U.S. at 710, 49 L.Ed.2d at 163). This Court applied that test and held that while "the decision to hire or discharge a minister is inextricable from religious doctrine and protected by the First Amendment from judicial inquiry," the plaintiffs' claim, rather than requiring "the trial court to inquire into the [c]hurch [d]efendants' reasons for choosing Privette to serve as a minister," "instead presents the issue of whether the [c]hurch [d]efendants knew or had reason to know of

Privette's propensity to engage in sexual misconduct," which is "conduct that the [c]hurch [d]efendants do not claim is part of the tenets or practices of the Methodist Church." *Id.* at 495, 495 S.E.2d at 398 (internal citation omitted). Therefore, "there [wa]s no necessity for the court to interpret or weigh church doctrine in its adjudication of the [p]laintiffs' claim for negligent retention and supervision." *Id.* at 495, 495 S.E.2d at 398. In so holding, this Court noted that "[t]he First Amendment . . . does not grant religious organizations absolute immunity from liability." *Id.* at 494, 495 S.E.2d at 397. "Indeed, the application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution." *Smith*, N.C. App. at 494, 495 S.E.2d at 397 (internal citations and quotation marks omitted).

In *Emory v. Jackson Chapel First Missionary Baptist Church*, the plaintiff church members brought an action against the church and the pastor, alleging they provided insufficient notice to plaintiffs as required by the church bylaws for a meeting at which the church altered its corporate structure and that defendants also violated the plaintiffs' contractual and property rights by failing to follow the procedure. This Court explicitly noted that "[o]ur Supreme Court has held that a trial court's exercise of jurisdiction is improper only where 'purely ecclesiastical questions and controversies are involved.'" *Id.* at 492, 598 S.E.2d at 670 (quoting *W. Conference of Original Free Will Baptists of N.C. v. Creech*, 256 N.C. 128, 140, 123 S.E.2d 619, 627 (1962)). This Court held the ecclesiastical entanglement doctrine

barred the trial court from determining whether the defendants provided the plaintiffs with sufficient notice under the bylaws, because ambiguities existed in the bylaws and "long-established church customs exist[ed] that may [have] alter[ed] the interpretation of the notice requirements [in the bylaws]." *Id.* at 492, 165 N.C. App. at 670. Thus, "the trial court would be required to delve into 'ecclesiastical matters' regarding how the church interprets the [] notice requirements and types of meetings [in the bylaws.]" *Id.* at 493, 598 S.E.2d at 671 (quoting *Piner*, 267 N.C. at 77, 147 S.E.2d at 583). In addition, this Court noted that, while plaintiffs asserted contract and property rights were implicated, the "heart of this matter [wa]s a change in the structure of the church" and "the claims of [the] plaintiffs [] only tangentially affect[ed] property rights." *Id.* at 494, 495, 598 S.E.2d at 671, 672. Thus, there was no "substantial property right" affected by the incorporation and the trial court properly held the ecclesiastical entanglement doctrine barred the claim. *Id.* at 495, 598 S.E.2d at 672.

Although the plaintiffs' claims in *Emory* "only tangentially affect[ed] property rights," *id.* at 495, 598 S.E.2d at 672, this Court has clarified the relationship between church membership as an ecclesiastical matter and property rights in subsequent cases. In *Tubiolo v. Abundant Life Church, Inc.*, 167 N.C. App. 324, 605 S.E.2d 161 (2004), we held that "membership in a church is a core ecclesiastical matter[,]" and "[i]t is an area where the courts of this State should not become involved." *Tubiolo*,

167 N.C. App. at 328, 605 S.E.2d at 164. However, we also held that "the plaintiffs' membership in the defendant is in the nature of a property interest, and that the courts do have jurisdiction over the very narrow issue of whether the bylaws were properly adopted by the defendant." *Id.* at 329, 605 S.E.2d at 164 (citing *Bouldin v. Alexander*, 82 U.S. 131, 139-40, 21 L.Ed. 69, 71-2 (1872)). Therefore, the case was distinguishable from *Emory*, because membership rights were implicated and "[t]his inquiry [into whether the bylaws were properly adopted] can be made without resolving any ecclesiastical or doctrinal matters." *Id.* at 329, 605 S.E.2d at 164-65. Nevertheless, this Court provided an important caveat on *Tubiolo* in *Azige v. Holy Trinity Ethiopian Orthodox Tewahdo Church*, 249 N.C. App. 236, 790 S.E.2d 570 (2016), where we held that the trial court was barred from considering issues based on church membership status because the issues "would require interpretation of [church] bylaws which do impose doctrinal requirements." *Azige*, 249 N.C. App. at 242, 790 S.E.2d at 575. For example, "[t]he courts c[ould ]not determine the 'immoral behavior' of plaintiffs for purposes of the bylaws . . . ." *Id.* at 244, 790 S.E.2d at 575. These claims "raise questions which . . . would 'require[] the court to interpret or weigh church doctrine' in contravention of the First Amendment," violating the test in *Smith*. *Id.* at 244, 790 S.E.2d at 575 (quoting *Davis v. Williams*, 242 N.C. App. 262, 892, 774 S.E.2d 889, 892 (2015)).

Besides property claims which involve ecclesiastical matters, this Court has also addressed tort and contract claims under the ecclesiastical entanglement doctrine. In *Doe v. Diocese of Raleigh*, the plaintiff filed complaints against the Diocese of Raleigh, the Bishop of the Diocese, and a priest of the diocese alleging, among other claims, claims for negligence against the Diocese and the Bishop, arguing they negligently supervised the priest and failed to educate the plaintiff about boundaries or require STD testing by the priest. *Doe*, 242 N.C. App. at 43-44, 776 S.E.2d at 32-33. Relying on *Smith* and *Harris*, this Court "examine[d] each of [the p]laintiff's remaining causes of action against the Diocese [d]efendants in order to determine whether its adjudication would require 'an impermissible analysis by the court based on religious doctrine or practice.'" *See id.* at 49, 776 S.E.2d at 36 (citing *Johnson v. Antioch United Holy Church, Inc.*, 214 N.C. App. 507, 711, 714 S.E.2d 806, 810 (2011); *Harris*, 361 N.C. at 274, 643 S.E.2d at 572).

As to the claim for negligent supervision, this Court analogized to the negligent supervision claim in *Smith* and held that in *Doe*, as in *Smith*, the ecclesiastical entanglement doctrine did not bar courts from determining whether the elements of negligent supervision could be established because, in both cases, there was a "commonsense understanding that *sexual misconduct* is not 'part of the tenets or practices of the [church.]'" *Id.* at 54, 776 S.E.2d at 38-39. Furthermore, this Court held that adjudicating the negligent supervision claim would not require the trial

13

court to determine issues that "are inextricably bound up with church doctrine," "such as (1) whether [the priest] should have ever been incardinated; (2) whether he should have been allowed to remain a priest; or (3) whether his relationship with the Diocese should have been severed." *Id.* at 55, 776 S.E.2d at 39. "[T]he issue to be determined in connection with [the p]laintiff's negligent supervision claim [wa]s a purely secular one." *Id.* at 55, 776 S.E.2d at 39.

In contrast, this Court held courts were barred from considering plaintiff's claim that the Diocese negligently failed to compel the priest to undergo STD testing because "this theory of liability *is premised on* the tenets of the Catholic church— namely, the degree of control existing in the relationship between a bishop and a priest," and it "seeks to impose liability based on the Diocese [d]efendants' alleged failure to exercise their authority over a priest stemming from an oath of obedience taken by him pursuant to the church's canon law." *Id.* at 56, 776 S.E.2d at 40 (emphasis in original). Thus, this claim fails because "a civil court is constitutionally prohibited from 'interpos[ing] its judgment' on the proper role of church leaders and the scope of their authority '[b]ecause a church's religious doctrine and practice affect its understanding of each of these concepts.'" *Id.* at 56, 776 S.E.2d at 40 (quoting *Harris*, 361 N.C. at 273, 643 S.E.2d at 571).

Finally, this Court addressed a claim for breach of contract in *Bigelow v. Sassafras Grove Baptist Church*, 247 N.C. App. 401, 786 S.E.2d 358 (2016). In

*Bigelow*, a pastor claimed the defendants, a Baptist church and its deacons, breached a contract and violated the North Carolina Wage and Hour Act by failing to pay him compensation and benefits after he became ill pursuant to a written contract entered into between himself and the defendants. *Bigelow*, 247 N.C. App. at 402, 786 S.E.2d at 360. This Court held the argument that "the First Amendment of the United States Constitution immunizes, without exception, a religious institution from liability arising out of a contract between the religious institution and its ministerial employees," was inconsistent with *Smith*. *Id.* at 411, 786 S.E.2d at 366. Furthermore, this Court held the plaintiff's claims did not "ask[] the court to address ecclesiastical doctrine or church law"; rather, they "require[d] the court only to make a secular decision regarding the terms of the parties' contract and to apply the neutral principles of the Wage and Hour Act." *Id.* at 411-12, 786 S.E.2d at 366. Therefore, the ecclesiastical entanglement doctrine did not bar courts from considering the plaintiffs' contract claims.

B. <u>Application of Ecclesiastical Entanglement Doctrine to Defamation Claims</u>

In summary, although the issue of the application of the ecclesiastical entanglement doctrine to defamation claims is a question of first impression for North Carolina, our state's extensive caselaw on the doctrine is "equally applicable here." *See Doe*, 242 N.C. App. at 49, 776 S.E.2d at 36.

Our courts must look to the specific elements of the cause of action to determine whether "neutral principles of law exist to resolve plaintiffs' claims." *Harris*, 361 N.C. at 273-74, 643 S.E.2d at 571. For instance, in *Harris*, our Supreme Court looked to the specific elements of the cause of action for breach of fiduciary duty and, in particular, the specific theory under the element of breach advanced by the plaintiff (i.e., "improperly using church funds," or "conversion") in order to determine whether the ecclesiastical entanglement doctrine would bar the claim. *See id.* at 273, 643 S.E.2d at 571. Because resolving that specific element would require courts to determine whether actions by the church leadership were "proper" based on the church's view of the roles of those individuals, the Supreme Court held the claim in that case was barred. *Id.* at 273, 643 S.E.2d at 571. Our courts have first identified the cause of action and the specific elements of that claim at issue in determining whether the claim is barred by the ecclesiastical entanglement doctrine. Our courts then determine whether "neutral principles of law exist to resolve plaintiffs' claims." *Harris*, 361 N.C. at 273-74, 643 S.E.2d at 572; *see Atkins*, 284 N.C. at 319, 200 S.E.2d at 650 ("[D]eterminations must be made pursuant to 'neutral principles of law, developed for use in all property disputes.'" (citation omitted)). This Court has held that we must answer "[t]he dispositive question" of "whether resolution of the legal claim requires the court to interpret or weigh church doctrine. If not, the First Amendment is not implicated and neutral principles of law are properly applied to

adjudicate the claim." *Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398 (citing *Milivojevich*, 426 U.S. at 710, 49 L.Ed.2d at 163).

In the present case, Plaintiffs allege multiple claims for defamation, including libel and slander *per se* and libel and slander *per quod.* "In order to recover for defamation, a plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Desmond v. News and Observer Pub. Co.*, 241 N.C. App. 10, 16, 772 S.E.2d 128, 135 (2015) (citation omitted). The only element of defamation that Defendants argue violates the ecclesiastical entanglement doctrine is the first element: the falsity of the alleged statement. I would hold that, in order to determine whether courts are barred from considering a claim for defamation, they must evaluate the specific elements of the claim, including the falsity of the alleged statement, and determine whether "resolution of [the truth or falsity of the alleged statement] requires the court to interpret or weigh church doctrine. If not, the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim." *Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398. However, if resolution of the claim would require courts to interpret or weigh church doctrine, the ecclesiastical entanglement doctrine under the First Amendment and Article I, Section 13 of the Constitution of North Carolina prohibit them from adjudicating the claim.

This statement of the law, grounded in our Court's precedent and first adopted from United States Supreme Court precedent, is more consistent with precedent than that adopted in the majority's opinion, which states that "[f]or defamation claims, we must consider whether a statement is true or false without examining or inquiring into ecclesiastical matters or church doctrine." The majority's imprecise rule conflates the broad prohibition against courts becoming entangled in "ecclesiastical matters" with the test adopted in *Smith* for determining whether "neutral principles of law are properly applied to adjudicate the claim." *Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398 (citing *Milivojevich*, 426 U.S. at 710, 49 L.Ed.2d at 163). Where neutral principles of law can be applied, resolving the claim would not impermissibly entangle the court in ecclesiastical matters. For instance, in *Tubiolo*, this Court held that "[m]embership in a church is a core ecclesiastical matter." *Tubiolo*, 167 N.C. App. at 328, 605 S.E.2d at 164. We nevertheless held that "the plaintiffs' membership in [a church] is in the nature of a property interest, and []the courts do have jurisdiction over the very narrow issue of whether the bylaws were properly adopted by the [church]." *Tubiolo*, 167 N.C. App. at 329, 605 S.E.2d at 164.

The majority incorrectly asserts, relying on *Doe*, that "[o]nly when an 'issue to be determined in connection with [a party's] claim is a *purely secular* one," then "[n]eutral principles of law govern th[e] inquiry and . . . subject matter jurisdiction exists in the trial court over th[e] claim.'" (emphasis in original) (quoting *Doe*, 242

N.C. App. at 55, 776 S.E.2d at 39). This is a misstatement of *Doe* and contrary to *Emory* where this Court noted that "[o]ur Supreme Court has held that a trial court's exercise of jurisdiction is improper only where 'purely ecclesiastical questions and controversies are involved.'" *Emory*, 165 N.C. App. at 492, 598 S.E.2d at 670 (quoting *Creech*, 256 N.C. at 140, 123 S.E.2d at 627); accord *W. Conference of Original Free Will Baptists v Creech*, 256 N.C. 128, 140, 123 S.E.2d 619, 627 (1962) ("The legal or temporal tribunals of the State have no jurisdiction over, and no concern with, purely ecclesiastical questions and controversies . . . but the courts do have jurisdiction, as to civil, contract[,] and property rights which are involved in, or arise from, a church controversy." (quoting *Reid*, 241 N.C. 201, 85 S.E.2d 114)). Under *Doe*, while a claim being "purely secular" is a sufficient condition to avoid the ecclesiastical entanglement doctrine, it is not a necessary one, and there may at times be a gray area of questions between those that are "purely secular" and "purely ecclesiastical."

The majority's approach to defamation claims does not consider our precedent which provides that "the courts do have jurisdiction, as to *civil*, contract[,] and property rights which are involved in, or arise from, *a church controversy*." *Creech*, 256 N.C. at 140, 123 S.E.2d at 627 (emphasis added) (quoting *Reid*, 241 N.C. 201, 85 S.E.2d 114). Where "neutral principles of law exist to resolve plaintiffs' claims," *Harris*, 361 N.C. at 273-74, 643 S.E.2d at 571-72, courts have not only the power but the duty to resolve the plaintiffs' claims, because "[n]either the First Amendment to

19

the Constitution of the United States nor the comparable provision in Article I, Section 13, of the Constitution of North Carolina deprives [participants in religious life] of protections afforded by government to all . . . , such as . . . access to the courts for the determination of [civil, ]contract[,] and property rights." *Atkins*, 284 N.C. at 318, 200 S.E.2d at 649. In the case of defamation claims, I would hold that neutral principles of law exist and the ecclesiastical entanglement doctrine does not bar a claim where resolving the claim's elements, including determining the truth or falsity of the alleged defamatory statement, would not require the court to interpret or weigh church doctrine.

C. <u>Analysis of Plaintiffs' Claims</u>

I concur in the majority's analysis of Plaintiffs' defamation claims based on statements made by Mr. Holleman in the 13 November 2012 Letter, the 28 November 2012 Sermon, the Ballot and Absentee Ballot, claims based on four statements made in the 16 January 2013 letter Mr. Holleman sent to Mr. Brewer, and the claim based on a statement made in the 25 April 2013 letter Mr. Holleman sent to Mr. Myers. Analyzing these statements would require our courts to "interpret or weigh church doctrine," and, therefore, resolving the claims would impermissibly entangle courts in ecclesiastical questions in violation of the First Amendment and Article I, Section 13 of the Constitution of North Carolina.

*McGEE, C.J., concurring in part and dissenting in part*

I disagree with the majority's analysis of Plaintiffs' defamation claims based on the 23 December 2012 oral statement allegedly made by Mr. Hix to an unidentified congregant; the statement in the 8 January 2013 email to Mr. Brewer, a church choir member; one claim based on a statement made in the 16 January 2013 letter Mr. Holleman sent to Mr. Brewer; and the claim based on a statement made in the 6 April 2013 email Mr. Holleman also sent to Mr. Brewer. In its analysis of these statements, the majority expands the ecclesiastical entanglement doctrine to bar defamation claims that can be resolved by the application of neutral principles of law. I will analyze these statements in turn.

(1) 23 December 2012 Alleged Oral Statement by Mr. Hix

Plaintiffs argue the following statement they allege Mr. Hix made to an unidentified DHBC congregant on 23 December 2012 is defamatory: "[Mr.] Lippard is a liar and you and other people like you are believing him instead of Scripture." In response, Defendants argue the statement "was made in the context of Mr. Hix's interpretation of and Mr. Lippard's compliance with Scripture" and that "[a]n inquiry into the falsity of the statement would require a comparison of Mr. Lippard's conduct with Scripture, which also prohibits lying. (*E.g., Rev.* 21:8)" The majority argues that "we would need to inquire into DHBC's definition of lying, when to believe scripture, and how scripture determines whom to believe," and that "[t]his is an issue

over DHBC's internal customs, practices, morality, and degree of control between members."

This statement contains two independent clauses, each with a complete thought. First, I would hold that courts would not have to interpret or weigh church doctrine in order to determine the truth or falsity of the first part of the claim, that "[Mr.] Lippard is a liar." Contrary to the arguments of Defendants and the majority, the meaning of "liar" in this alleged oral statement is not ambiguous and would not require interpretation of the Book of Revelation, or interpretation or weighing of "DHBC's definition of lying" to determine. In interpreting allegedly defamatory statements, our courts construe the meaning of statements "as ordinary people would understand" them. *Renwick v. News and Observer Pub. Co.*, 310 N.C. 312, 319, 312 S.E.2d 405, 409 (1984). In ordinary usage, "liar" means "a person who tells lies," and "lie" means, *inter alia,* "an assertion of something known or believed by the speaker to be untrue with intent to deceive." *See Merriam-Webster's Collegiate Dictionary* 716, 717 (11th Ed. 2003). Although Mr. Hix is an employee of DHBC, there is no indication that there is a special "definition of lying" unique to DHBC. Therefore, I would hold courts are not barred from determining a claim based on the alleged statement by Mr. Hix that Mr. Lippard is a liar.

Second, the majority argues that "you and other people like you are believing him instead of Scripture" means that "we would need to inquire into . . . when to

believe scripture, and how scripture determines whom to believe[,]" to determine the truth or falsity of the claim that Mr. Lippard is a liar. However, courts would only need to determine whether Mr. Lippard knowingly made factually untrue statements with the intent to deceive or not, an inquiry which does not require interpreting or weighing church doctrine. I would hold the second phrase does not sufficiently allege a defamation claim against Mr. Lippard because it is a statement of opinion and not fact and does not target Mr. Lippard, but other unnamed churchgoers. Assuming the alleged statement is capable of verification and directed against Mr. Lippard, I would hold considering the particular implied claim that Mr. Lippard is not following scripture is barred by the ecclesiastical entanglement doctrine, as courts cannot determine whether Mr. Lippard is contravening scripture without inquiring into what scripture requires.

That this claim would be barred does not affect the alleged statement that Mr. Lippard is a liar. In a footnote, the majority argues that "[w]e cannot separate the 23 December 2012 statement into two parts and must read it as a whole because it is a complete sentence without a comma that would indicate a compound sentence of thoughts." I would not hold the absence of a comma in a written allegation of an oral statement is dispositive of its interpretation; rather, because both conjuncts can stand alone as individual sentences, they are independent clauses and each expresses a complete thought. But even taken as a whole, in the alleged statement Mr. Hix still

accuses Mr. Lippard of being a liar, an allegation courts are capable of determining the truth or falsity of which without weighing church doctrine. Therefore, I would hold the ecclesiastical entanglement doctrine cannot bar Plaintiffs' claim that Mr. Hix defamed Mr. Lippard by claiming he was a liar.

(2) 8 January 2013 Email by Mr. Hix to Mr. Brewer

Plaintiffs also allege defamation based on Mr. Hix's statement in a subsequent email to Mr. Brewer, a choir member, stating: "Note also that there are verifiable facts and Biblical scriptures which [Plaintiffs] are openly denying and defying. Those facts and scriptures still stand." This statement, like the last by Mr. Hix, mixes allegations that Plaintiffs are lying—"there are verifiable facts . . . which [Plaintiffs] are openly denying . . ."—with allegations that Plaintiffs are contravening scriptural requirements—"there are . . . Biblical scriptures which [Plaintiffs] are openly . . . defying." At deposition, Mr. Hix said "[t]he facts that the (sic) late and/or not showing up for worship services when we're paying her to be on the schedule" were the "verifiable facts" to which he was referring. Here, as in the previous statement, I would hold that courts are not barred from considering a defamation claim based on the allegation that Plaintiffs are "openly denying" "verifiable facts," or lying. I would hold that determining the truth or falsity of whether Plaintiffs were "openly denying" the "verifiable fact" that Ms. Lippard was repeatedly late or not

showing up for worship services would not require courts to interpret or weigh church doctrine and courts are not barred from making that limited inquiry.

(3) <u>16 January 2013 Letter by Mr. Holleman to Mr. Brewer</u>

Mr. Holleman sent a lengthy letter on 16 January 2013 to Mr. Brewer. Plaintiffs argue, among others, five statements contained in the letter are defamatory. Defendants contend courts are barred from considering each of these statements based on the ecclesiastical entanglement doctrine. While I concur with the majority that courts are barred from considering four of the statements because they would require courts to interpret or weigh church doctrine, I disagree with the majority's holding that courts are barred from considering the following statement written by Mr. Holleman: "No doubt there are more strategies against the church leadership playing out tonight." I would hold courts are not barred from considering this claim because determining the truth or falsity of whether "there [were] more strategies against the church leadership playing out" would not require the interpretation or weighing of church doctrine. The letter stated in pertinent part:

> [A]s far as I'm aware, every new conversation or controversy has been initiated by [the Plaintiffs], or by those who have been advocating for their position [as opposed to the church leadership]. You yourself have attempted to engage me in conversation at the church. . . . You have written this letter and had it delivered to me, Bryan Sherrill, and Bill Wooten. [Mr. Lippard] has confronted [Mr. Hix] multiple times, and this very day, I've met with Billy Lynch for breakfast, whom [Mr. Lippard] had confronted at Church with a copy of [Mr. Hix's] directives to [Ms. Lippard]. I've learned that [Mr. Lippard] has e-mailed [Mr. Hix] requesting an explanation for why he and [Ms. Lippard] have not been returned to the solo rotation. And Bryan Sherrill indicates that [Mr.

25

> Lippard] called him today attempting to "catch" me in some mistake. These are just a few. No doubt there are more strategies against the church leadership playing out tonight.

In their brief, Plaintiffs argue this statement implies "nefarious motives ascribed to Ms. Lippard by [Mr.] Holleman." The context of the statement makes clear that "strategies" in this context means "a careful plan or method" and "a clever stratagem," here with a negative connotation. *See Merriam-Webster's Collegiate Dictionary* 1233 (11th Ed. 2003). Mr. Holleman is accusing Ms. Lippard of coordinating the meetings and stirring dissension. The truth or falsity of the statement that "there [were] more strategies against the church leadership playing out [that ]night" could be determined by a court without inquiring into religious doctrine or practice, such as by determining whether Ms. Lippard asked or instructed others to communicate on her behalf or to actively oppose the action of the church leadership. Therefore, I would hold the claim is not barred by the ecclesiastical entanglement doctrine.

Although the majority concedes that this statement "does not directly [involve] scripture" it nevertheless argues that "it does involve other ecclesiastical matters." However, the majority does not rely on the definition of "ecclesiastical matter" adopted by our Supreme Court. It does not argue that this is a matter "which concerns . . . the adoption and enforcement within a religious association of needful laws and regulations for the government of membership[,]" nor that it concerns "the power of excluding from such associations those deemed unworthy of membership by

26

the legally constituted authorities of the church . . . ." *Piner*, 257 N.C. at 77, 147 S.E.2d at 583. The Plaintiffs' claim that this statement is defamatory is neither.

Instead, the majority asserts that "[p]lainly, this controversy and ongoing dispute with the Plaintiffs is a matter of DHBC's internal membership, organization, governance, discipline, and degree of control between members" and that "[w]e cannot decide the rightness or wrongness of this statement by a pastor communicating with his flock." "[B]ut," contrary to the majority's argument, "the courts do have jurisdiction, as to *civil*, contract[,] and property rights which are involved in, or arise from, *a church controversy*." *Creech*, 256 N.C. at 140, 123 S.E.2d at 627 (emphasis added) (quoting *Reid*, 241 N.C. 201, 85 S.E.2d 114). An act that would otherwise give rise to an actionable tort claim is not immunized merely because it arose in the context of a communication between a pastor and a churchgoer where neutral principles of law could be applied to resolve the claim. *See Smith*, 128 N.C. App. at 495, 495 S.E.2d at 398 (concluding that a holding "that a religious body must be held free from any responsibility for wholly predictable and foreseeable injurious consequences of personnel decisions, although such decisions incorporate no theological or dogmatic tenets—would go beyond First Amendment protection and cloak such bodies with an exclusive immunity greater than that required for the preservation of the principles constitutionally safeguarded." (internal citation omitted)); *accord Bigelow*, 247 N.C. App. at 411, 786 S.E.2d at 366 (holding

"unsupported assertion" that First Amendment "immunizes, without exception, a religious institution from liability arising out of a contract between the religious institution and its ministerial employees . . . cannot be reconciled with *Smith.*"). Contrary to the majority's argument, resolving this claim does not require courts to determine the "rightness or wrongness" of the pastor's statement; resolving the claim merely requires that courts determine the truth or falsity of it. That particular question "does not directly [involve] scripture," as the majority concedes, and would not require courts to interpret or weigh church doctrine. Therefore, I would hold it can be resolved by the application of neutral principles of law and is not barred by the ecclesiastical entanglement doctrine.

(4) 6 April 2013 Email by Mr. Holleman to Mr. Brewer

Finally, the Plaintiffs also argue that the following statement in the 6 April 2013 email to Mr. Brewer was defamatory:

> There were several there the Wednesday night that [Mr. Lippard], with [Ms. Lippard] behind him, blocked [Mr. Hix's] exit from the music room and was aggressively going after [Mr. Hix], pointing his finger in [Mr. Hix's] face, an action I recently learned was illegal and could have very well been reported as a crime.

Determining the truth or falsity of this allegation of the commission of an allegedly criminal act would not require courts to interpret or weigh church doctrine any more than the same accusation from any other person based on any other crime would. The statement does not allege that Plaintiffs violated an ecclesiastical law, which

28

would require such interpretation or weighing of doctrine. Rather, determining the truth or falsity of this statement merely requires courts to determine whether or not Mr. Lippard in fact "blocked [Mr. Hix's] exit from the music room and []aggressively [went] after [Mr. Hix], pointing his finger in [Mr. Hix's] face." Therefore, I would hold this claim could be resolved based on the application of neutral principles of law and is not barred by the ecclesiastical entanglement doctrine.

The majority argues deciding this particular claim is indistinguishable from *Harris* because "we would be forced to determine whether the statement at issue is proper in light of DHBC's doctrine and practice regarding membership and conduct." This is a misreading of *Harris*. In *Harris*, the reason the court would have had to inquire into whether expenditures made by the church leadership were "proper" to resolve the claim was because the cause of action the plaintiffs alleged was breach of fiduciary duty, and the only theory alleged by the plaintiffs for the specific element of breach of fiduciary duty was that the defendants "improperly us[ed] church funds, which constitutes conversion." *Harris*, 361 N.C. at 273, 643 S.E.2d at 572. Therefore, determining whether the church leadership's challenged action was proper was an essential issue to the claim before the court. Here, in contrast, the issue is whether Mr. Holleman's statement about Plaintiffs was true or false; the court need not determine whether this statement or Mr. Holleman's actions were "proper" or

consider "how [DHBC] should react to what it considers improper conduct" to resolve the claim.

I would hold that Plaintiffs' claims based on these statements are not barred by the ecclesiastical entanglement doctrine because courts could evaluate the specific elements of each of these claims, including the falsity of the alleged statement, without interpreting or weighing church doctrine. Therefore, "the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim[s]." *Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398; *see Harris*, 361 N.C. at 273-74, 643 S.E.2d at 571 (holding claims barred by ecclesiastical entanglement doctrine "[b]ecause no neutral principles of law exist to resolve plaintiffs' claims.").

D. Substantive Defamation Claims

Although I concur with the majority that the ecclesiastical entanglement doctrine bars courts from analyzing most of Plaintiffs' claims, and I dissent and would hold that four claims are not barred, there remain other issues to resolve. In granting summary judgment to Defendants, the trial court also held (1) "[a]s a matter of law, none of the Defendants' statements are defamatory *per se*" and (2) "Plaintiffs did not provide any evidentiary forecast that they suffered special damages because of any of Defendants' allegedly defamatory *per quod* statements." On appeal, Plaintiffs argue that they "have met all the elements of defamation cases [(sic)] whether *per se*, or *per quod*." I disagree, and I would hold that, for the claims that I believe are not barred

by the ecclesiastical entanglement doctrine, Plaintiffs have failed to show the claims

constitute libel or slander *per se* or *per quod*.

"Three classes of libel are recognized under North Carolina law." *Renwick*,

310 N.C. at 316, 312 S.E.2d at 408.

> They are: (1) publications obviously defamatory which are called libel *per se*; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod*.[8]

*Id.* at 316, 312 S.E.2d at 408 (quoting *Arnold v. Sharpe*, 296 N.C. 533, 537, 251 S.E.2d

452, 455 (1979)).

> Libel *per se* is a publication which, when considered alone without explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace.

*Skinner v. Reynolds*, 237 N.C. App. 150, 152, 764 S.E.2d 652, 655 (2014) (citations

omitted) (emphasis omitted).

> Further: [] Defamatory words to be libelous *per se* must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned

---

[8] In contrast, slander—an "oral defamatory utterance[]"—is only actionable *per se* or *per quod*, not as a publication susceptible of two interpretations. *Penner v. Elliott*, 225 N.C. 33, 34, 33 S.E.2d 124, 125 (1945).

and avoided. Although someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability, a pure expression of opinion is protected because it fails to assert actual fact. This Court considers how the alleged defamatory publication would have been understood by an average reader. In addition, the alleged defamatory statements must be construed only in the context of the document in which they are contained, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The articles must be defamatory on its face within the four corners thereof.

*Id.* at 152-53, 764 S.E.2d at 655 (internal citations and quotations omitted) (emphasis omitted).

In their brief, Plaintiffs do not identify which of the dozens of allegedly defamatory statements they cite are defamatory *per se*. Upon my review of the record and the briefs, the only statement not barred by the ecclesiastical entanglement doctrine that Plaintiffs might colorably argue was libel *per se* was Mr. Holleman's description of Plaintiffs' alleged behavior in the 6 April email to Mr. Brewer, which Mr. Holleman characterized as "illegal" and "could very well have been reported as a crime."[9] There is a question as to whether the behavior alleged—"block[ing] [Mr. Hix's] exit from the music room," "aggressively going after [Mr. Hix]," and "pointing his finger in [Mr. Hix's] face"—constitutes an "infamous crime."

---

[9] Despite Plaintiffs' repeated assertions, none of the statements alleged "tend[] to subject [Plaintiffs] to ridicule, contempt, or disgrace" as a matter of law. *Skinner*, 237 N.C. App. at 152, 764 S.E.2d at 655.

"At common law, . . . an infamous crime is one whose commission brings infamy upon a convicted person, rendering him unfit and incompetent to testify as a witness, such crimes being treason, felony, and *crimen falsi*." *Aycock v. Padgett*, 134 N.C. App. 164, 166, 516 S.E.2d 907, 909 (1999) (citations omitted). Under N.C. Gen. Stat. § 14-39 (2017), the felony of kidnapping includes an "unlawful[] confine[ment], restrain[t], or remov[al] from one place to another [of] any other person 16 years of age or over without the consent of such person" for one of several enumerated purposes. False imprisonment is a lesser included offense of kidnapping. *State v. Pigott*, 331 N.C. 199, 210, 415 S.E.2d 555, 562 (1992). "The difference between kidnapping and the lesser included offense of false imprisonment is the purpose of the confinement, restraint, or removal of another person: the offense is kidnapping if the purpose of the restraint was to accomplish one of the purposes enumerated in the kidnapping statute." *Id.* at 210, 415 S.E.2d at 562 (citation omitted). False imprisonment was a misdemeanor at common law and, as it was not superseded by N.C.G.S. § 14-39, remains so in North Carolina. *See State v. Fulcher*, 34 N.C. App. 233, 242, 237 S.E.2d 909, 915 (1977), *affirmed by State v. Fulcher*, 294 N.C. 503, 243 S.E.2d 338 (1978) ("The common-law crime of false imprisonment, a general misdemeanor, has not been superseded by the new kidnapping statute because there may be an unlawful restraint without the purposes specified in the statute.").

The conduct Mr. Holleman alleges occurred, being Mr. Holleman's blocking of Mr. Hix in the music room with his body, does not rise to the level of kidnapping or false imprisonment, as there is nothing in the statement to indicate Mr. Hix was truly confined or restrained. Even assuming, *arguendo*, that Mr. Hix was confined against his will, there is no evidence in the statement by Mr. Holleman that he claimed Plaintiffs acted with one of the specific purposes enumerated in the kidnapping statute. *See* N.C.G.S. § 14-39. Therefore, at most, the conduct Mr. Holleman describes would be false imprisonment. As it is only a misdemeanor, not a felony, and not treason or a *crimen falsi*, false imprisonment is not an "infamous crime." Therefore, the allegedly defamatory statement in the 6 April email, like the rest of the statements Plaintiffs allege were defamatory, is not libel *per se*.

Plaintiffs further contend the trial court erred in granting Defendants' motion for summary judgment on the basis that Plaintiffs failed to "provide any evidentiary forecast that they suffered special damages because of any of Defendants' allegedly defamatory *per quod* statements." I disagree.

> Libel *per quod* may be asserted when a publication is not obviously defamatory, but when considered in conjunction with innuendo, colloquium, and explanatory circumstances it becomes libelous. To state a claim for libel *per quod*, a party must specifically allege and prove special damages as to each plaintiff.

*Skinner*, 237 N.C. App. at 157, 764 S.E.2d at 657-58 (internal quotations and citations omitted). This Court has distinguished special damages from general damages as follows:

> General damages are the natural and necessary result of the wrong, are implied by law, and may be recovered under a general allegation of damages. But special damages, those which do not necessarily result from the wrong, must be pleaded, and the facts giving rise to the special damages must be alleged so as to fairly inform the defendant of the scope of plaintiff's demand.

*Griffin v. Holden*, 180 N.C. App. 129, 138, 636 S.E.2d 298, 305 (2006) (citing *Rodd v. W.H. King Drug Co.*, 30 N.C. App. 564, 568, 228 S.E.2d 35, 38 (1976)). "Special damage, as that term is used in the law of defamation means pecuniary loss, as distinguished from humiliation." *Williams v. Rutherford Freight Lines, Inc.*, 10 N.C. App. 384, 387, 179 S.E.2d 319, 322 (1971) (citing *Penner v. Elliott*, 225 N.C. 33, 33 S.E.2d 125 (1945)) (additional citations omitted). Indeed, "emotional distress and mental suffering are not alone sufficient to establish a basis for relief in cases which are actionable only *per quod.*" *Id.* at 390, 179 S.E.2d at 324 (citations omitted). Of course, some pecuniary damages may stem from mental anguish and humiliation, such as the cost of psychological treatment attributable to the defamatory statement. *See, e.g., Tallent v Blake*, 57 N.C. App. 249, 255, 291 S.E.2d 336, 340-41 (1982) ("Special damages include illness sufficient to require medical care and expense."); *Araya v. Deep Dive Media, LLC*, 966 F. Supp. 2d 582, 599-600 (W.D.N.C. 2013)

(holding that cost of treatment and psychological counseling for emotional distress satisfied requirement for special damages in libel *per quod* claim).

Furthermore, at summary judgment, a plaintiff must "produce an evidentiary forecast to support a *prima facie* showing of special damages to survive defendant's motion for summary judgment on [a] claim of libel *per quod*." *Griffin*, 180 N.C. App. at 138, 636 S.E.2d at 305 (citing *Renwick*, 310 N.C. at 312, 312 S.E.2d at 408 ). Mere allegations and "pure speculation" are insufficient at this stage. *Id.* at 138-39, 636 S.E.2d at 305. In the present case, Plaintiffs claim they have suffered "damages for injury to their reputation and mental anguish and humiliation," in addition to seeking punitive damages and "full reimbursement of their attorney's fees." Mr. Lippard also claims that "his reputation as a builder home inspector and real estate agent has been tarnished as a result of the publication of [the 28 November sermon] and the other defamatory remarks attributed to [Defendants] against [Mr. Lippard]."

Plaintiffs fail to meet their burden of producing a forecast of evidence sufficient to make a *prima facie* showing of special damages. Mental anguish and humiliation are not sufficient to satisfy the requirement for special damages. *See Williams*, 10 N.C. App. at 387, 179 S.E.2d at 322. Rather, to survive a motion for summary judgment, Plaintiffs must show "pecuniary loss, as distinguished from humiliation." *Williams*, 10 N.C. App at 387, 179 S.E.2d at 322. However, despite their general allegation, Plaintiffs have failed to show any particular pecuniary damages arising

from the mental anguish, emotional harm, and humiliation they claim to have suffered, such as costs for therapy or mental health care.

Mr. Lippard additionally claims that Defendants' alleged statements have "tarnished" "his reputation as a builder, home inspector[,] and real estate agent," and that his "yearly income from 2010 through 2016" is "proof of pecuniary injury as a result of the defamation of [Defendants]." Mr. Lippard's reported income shows $13,804.00 for 2010, $31,169 for 2011, $9,824.00 for 2012, and $18,008 for 2013, the year following the publication of the majority of the allegedly defamatory statements at issue. Mr. Lippard has failed to show how the allegedly defamatory statements resulted in pecuniary harm. Without more, any connection between Plaintiffs' income and Defendants' statements, particularly those allegedly defamatory statements which courts are not barred from considering by the First Amendment, is "pure speculation." *Griffin*, 180 N.C. App. at 138-39, 636 S.E.2d at 305. Plaintiffs have failed to show special damages so as to warrant denial of Defendant's motion for summary judgment on the libel and slander *per quod* claims.

### III. Conclusion

In the case of defamation claims, I would hold that courts must evaluate the specific elements of the claim, including the falsity of the alleged statement, and determine whether "resolution of [the truth or falsity of the alleged statement] requires the court to interpret or weigh church doctrine. If not, the First Amendment

is not implicated and neutral principles of law are properly applied to adjudicate the claim." *Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398. Based on this analysis, I concur with the majority's holding for some of Plaintiffs' claims that they are barred because resolving the claims requires courts to interpret or weigh church doctrine.

For the four allegedly defamatory statements discussed above—Mr. Hix's oral allegation that Mr. Lippard is a liar and written allegation that Plaintiffs denied "verifiable facts," along with Mr. Holleman's statements that "strategies" were playing out against church leadership and that Mr. Lippard allegedly committed a crime—I disagree and would hold that there is no need for the court to interpret or weigh church doctrine in its adjudication of the truth or falsity of these claims.

> [The majority's] contrary holding—that a religious body must be held free from any responsibility for [allegedly defamatory statements,] although such [statements] incorporate no theological or dogmatic tenets—[]go[es] beyond First Amendment protection and cloak[s] such bodies with an exclusive immunity greater than that required for the preservation of the principles constitutionally safeguarded.

*Smith*, 128 N.C. App. at 495, 495 S.E.2d at 398 (citation omitted). Therefore, I dissent in part. For these claims that I would hold are not barred by the ecclesiastical entanglement doctrine, I would nevertheless hold that Plaintiffs have not shown sufficient evidence for libel *per se* or special damages as required for libel or slander *per quod*. Therefore, I concur in the majority's judgment affirming the trial court's grant of summary judgment for Defendants.